UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(1)   DAVID SIDOO,<br>(2)   GREGORY COLBURN, and<br>(3)   AMY COLBURN,<br><br>            Defendants | Criminal No.: 19-10080-NMG<br><br>Violations:<br><br>Count One: Conspiracy to Commit<br>Mail and Wire Fraud and Honest<br>Services Mail and Wire Fraud<br>(18 U.S.C. § 1349)<br><br>Count Two: Money Laundering Conspiracy<br>(18 U.S.C. § 1956(h))<br><br>Forfeiture Allegations:<br>(18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461)<br><br>Money Laundering Forfeiture Allegations:<br>(18 U.S.C. § 982(a)(1)) |

## SUPERSEDING INDICTMENT

At all times relevant to this Superseding Indictment:

### General Allegations

1.      Defendant DAVID SIDOO ("SIDOO") was a resident of Vancouver, Canada.

2.      Defendant GREGORY COLBURN was a resident of Palo Alto, California.

3.      Defendant AMY COLBURN was a resident of Palo Alto, California.

4.      GREGORY COLBURN and AMY COLBURN (together, "the COLBURNS") were a married couple.

5.      The Edge College & Career Network, LLC, also known as "The Key," was a for-profit college counseling and preparation business based in Newport Beach, California that was established in or about 2007 and registered in California in or about 2012.

6.      The Key Worldwide Foundation ("KWF") was a non-profit corporation founded in or about 2012 and based in Newport Beach, California. In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax, and that individuals who contributed to KWF could deduct those contributions from their taxable income, subject to certain limitations.

7.      ACT, Inc. was a non-profit organization headquartered in Iowa City, Iowa that administered the ACT, a standardized test that is widely used as part of the college admissions process in the United States.

8.      The College Board was a non-profit organization headquartered in New York, New York. Together with Educational Testing Service ("ETS"), a non-profit organization headquartered in Lawrence Township, New Jersey, the College Board developed and administered the SAT, a standardized test that, like the ACT, is widely used as part of the college admissions process in the United States. The College Board and ETS also developed and administered SAT subject tests, which are also used as part of the college admissions process.

9.      William "Rick" Singer was a resident, variously, of Sacramento and Newport Beach, California. Singer founded and, together with others, operated The Key and KWF.

10.     Mark Riddell was a resident of Palmetto, Florida. Riddell was employed at relevant times as the director of college entrance exam preparation at a private college preparatory school and sports academy in Bradenton, Florida.

11.     Igor Dvorskiy was a resident of Sherman Oaks, California. Dvorskiy was employed as the director of a private elementary and high school located in West Hollywood, California (the

"West Hollywood Test Center"). Dvorskiy also served as a compensated standardized test administrator for ACT, Inc. and the College Board.

### General Background on Standardized Testing

12.     Most selective colleges and universities in the United States require prospective students to submit standardized test scores—typically, either the ACT or the SAT—as part of their application packages. When submitted, standardized test scores are a material part of the admissions process.

13.     The ACT includes sections on English, mathematics, reading, and science, and is scored on a scale of 1 to 36

14.     The SAT includes sections on writing, critical reading, and mathematics. Between 2005 and January 2016, the SAT was scored on a scale of 600 to 2400. As of March 2016, the SAT has been scored on a scale of 400 to 1600.

15.     The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits. In some instances, however, students with certain learning or other disabilities may qualify for testing accommodations, including extended time, and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by ACT, Inc. or the College Board.

16.     Compensated ACT and SAT administrators owe a duty of honest services to ACT, Inc. and/or the College Board.

17.     Prior to administering the ACT, test administrators must typically certify that they will administer the test in accordance with the ACT Administration Manual, and that they will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."

3

18.     Similarly, prior to administering the SAT, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT test is the property of the College Board, and that no one other than the student can "open the test book and see the test content."

19.     The ACT tests are typically sent to and from the testing sites via Federal Express, a private, interstate commercial carrier.

20.     The SAT tests are typically sent to and from the testing sites via United Parcel Service ("UPS"), a private, interstate commercial carrier.

21.     The ACT and SAT tests, and the scores students earn on those tests, are the intellectual and physical property of ACT, Inc. and the College Board, respectively.

The Fraud Conspiracy

22.     From in or about 2011 through in or about February 2019, the defendants conspired with others known and unknown to the Grand Jury to use bribery and other forms of fraud to facilitate their children's admission to selective colleges and universities in the District of Massachusetts and elsewhere.

Objects and Purposes of the Fraud Conspiracy

23.     The principal objects and purposes of the fraud conspiracy were to commit mail and wire fraud, and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346, by, among other things:

    a.   Cheating on college entrance exams, including in many instances by bribing exam administrators to permit such cheating;

    b.   Bribing university athletic coaches and administrators to designate applicants as purported athletic recruits, regardless of their athletic abilities

4

and, in some cases, even though they did not play the sport they were purportedly recruited to play;

c. Having a third party take classes in place of the actual students, with the understanding that grades earned in those classes would be submitted as part of the students' college applications; and

d. Submitting falsified applications for admission to universities in the District of Massachusetts and elsewhere that, among other things, included the fraudulently obtained exam scores and class grades, and often listed fake awards and athletic activities.

<u>Manner and Means of the Fraud Conspiracy</u>

24.     Among the manner and means by which the defendants and others known and unknown to the Grand Jury carried out the fraud conspiracy were the following:

a. Seeking extended time for their children on college entrance exams, including by having the children purport to have learning disabilities in order to obtain the medical documentation that ACT, Inc. and the College Board typically require before granting students extended time;

b. Changing the location of the exams to one of two test centers: a public high school in Houston, Texas (the Houston Test Center) or the "West Hollywood Test Center";

c. Bribing college entrance exam administrators at the Houston Test Center and the West Hollywood Test Center to permit cheating, in violation of their duty of honest services to ACT, Inc. and/or the College Board;

d.  Paying Riddell or another third party to pose as an ACT or SAT exam proctor, or as a student taking the exam, so that he could secretly provide students with answers during the exam, replace the students' exam responses with his own, or simply take the exam in place of the students;

e.  Submitting the fraudulently obtained ACT and SAT scores as part of the college admissions process, including to colleges and universities in the District of Massachusetts;

f.  Bribing athletic coaches and university administrators to designate students as purported athletic recruits or as members of other favored admissions categories;

g.  Fabricating athletic "profiles" containing falsified athletic credentials—including fake honors the students purportedly received, elite athletic teams they purportedly played on, and staged photographs of the students purportedly engaged in athletic activity—to submit in support of the students' college applications; and

h.  Explaining to clients and prospective clients of The Key that these fraudulent schemes were tried-and-true methods of improving exam scores and gaining admission to college that had been successfully employed by many other clients.

### Acts in Furtherance of the Fraud Conspiracy

25.     On various dates from in or about 2011 through in or about February 2019, the defendants and others known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the fraud conspiracy:

### DAVID SIDOO

26.     In or about the fall of 2011, SIDOO agreed to pay Singer $100,000 to have Riddell secretly take the SAT in place of SIDOO's older son.

27.     In or about September 2011, SIDOO e-mailed Singer copies of his older son's driver's license and student identification card for the purpose of creating a falsified identification card for Riddell.

28.     Singer used the documents to obtain a falsified identification card bearing Riddell's likeness and the name of SIDOO's older son.

29.     On or about December 2, 2011, Riddell flew from Tampa, Florida to Vancouver, Canada to take the SAT in place of SIDOO's older son.

30.     In order to minimize suspicion and reduce the chance of getting caught, Singer directed Riddell not to obtain too high a score, because SIDOO's older son had previously taken the exam himself and obtained a total score of 1460 out of a possible 2400.

31.     On or about December 3, 2011, Riddell used the falsified identification card to pose as SIDOO's older son in order to secretly take the SAT in his place. Riddell earned a total score of 1670 out of a possible 2400.

32.     After the exam, on December 3, 2011, Riddell returned to Tampa.

33.     On or about December 23, 2011, Singer e-mailed a copy of the SAT score Riddell secretly obtained to an administrator at Chapman University ("Chapman"), a private university in Orange, California, on behalf of SIDOO's older son.

7

34.     SIDOO's older son was admitted to Chapman on or about January 24, 2012, and ultimately enrolled at that university.

35.     SIDOO paid Singer $100,000, as agreed, for having Riddell take the SAT for SIDOO's older son.

36.     In or about 2012, SIDOO agreed to pay Singer to have Riddell secretly take a Canadian high school graduation exam in place of SIDOO's older son.

37.     On or about May 15, 2012, Singer purchased plane tickets for Riddell to fly from Tampa to Vancouver on June 8, 2012, and to return to Tampa shortly thereafter.

38.     On or about June 8, 2012, Riddell flew to Vancouver.

39.     On or about June 9, 2012, Riddell posed as SIDOO's older son in order to secretly take the Canadian high school graduation exam in his place.

40.     After the exam, on June 10, 2012, Riddell returned to Tampa.

41.     In or about the fall of 2012, SIDOO agreed to pay Singer $100,000 to have Riddell secretly take the SAT in place of SIDOO's younger son.

42.     On or about October 31, 2012, SIDOO emailed Singer a document listing his younger son's address and other biographical information for the purpose of creating a falsified identification card for Riddell.

43.     Singer used the information to obtain a falsified identification card bearing Riddell's likeness and the name of SIDOO's younger son.

44.     On or about November 22, 2012, Singer purchased a plane ticket for Riddell to fly from Tampa to Los Angeles, California on November 29, 2012, in order to take the SAT for SIDOO's younger son.

45.     Singer directed Riddell to obtain a high score because SIDOO's younger son had not previously taken the SAT.

46.     On or about November 29, 2012, Riddell flew from Tampa to Los Angeles.

47.     On or about December 1, 2012, Riddell used a falsified identification card to pose as SIDOO's younger son in order to secretly take the SAT in his place at a high school in Orange County, California. Riddell earned a total score of 2280 out of a possible 2400.

48.     After the exam, Riddell returned to Tampa.

49.     On or about January 21, 2013, SIDOO sent an e-mail to Singer asking for wire transfer instructions.

50.     On or about January 22, 2013, an employee of The Key provided SIDOO with wire instructions for a company bank account in California.

51.     On or about January 23, 2013, SIDOO wired $100,000 to the account, as agreed, for having Riddell take the SAT for SIDOO's younger son.

52.     In 2013 and 2014, the SAT scores Riddell secretly obtained on behalf of SIDOO's younger son were submitted as part of his applications to colleges and universities in the United States, including on or about December 6, 2013 to Yale University in New Haven, Connecticut, on or about November 1, 2013 to the University of California – Berkeley, and on or about March 12, 2014 to Georgetown University in Washington, D.C.

53.     In or about March 2014, SIDOO's younger son was accepted to the University of California – Berkeley, and he later enrolled at that university.

54.     Singer paid Riddell approximately $5,000 plus travel expenses for each of the three exams Riddell took in place of SIDOO's children.

55.    On or about October 25, 2018, Singer called SIDOO from Boston, Massachusetts. During the call, SIDOO noted that his older son was applying to business school, adding, "I thought you were gonna call me and say I got a 2100 on my GMAT"—a reference to a standardized test that is widely used as part of the business school admissions process, which is scored on a scale of 200 to 800. Singer responded, "They don't have a 2100 for the GMAT. But I would do my best to get it for ya." SIDOO replied, "I know."

<u>GREGORY COLBURN and AMY COLBURN</u>

56.    In or about the fall of 2017, GREGORY COLBURN and AMY COLBURN agreed to pay Singer $25,000 to have Riddell pose as a proctor for their son's SAT exam and secretly correct his answers.

57.    On or about October 10, 2017, AMY COLBURN e-mailed Singer that she was waiting to hear back from the College Board about whether her son would be granted extended time to take the SAT.

58.    On or about October 22, 2017, the College Board granted the COLBURNS' son extended time to take the SAT.

59.    On or about December 31, 2017, Singer e-mailed AMY COLBURN an admission ticket for the COLBURNS' son for an SAT exam with extended time to be administered on or about March 10, 2018.

60.    On or about February 1, 2018, Dvorskiy submitted paperwork to the College Board to change the location of the March 10 test site from the COLBURNS' son's high school in Palo Alto to the West Hollywood Test Center.

61.     On or about March 9, 2018, Riddell flew from Tampa to Los Angeles to purport to proctor the SAT for the COLBURNS' son and another student who took the test at the West Hollywood Test Center that same day.

62.     Singer directed Riddell not to obtain too high a score on the COLBURNS' son's SAT, so that the child would not be alerted to the cheating on his behalf.

63.     After the students had completed the exam, Riddell reviewed and corrected their answers.

64.     Riddell earned a total score of 1190 out of a possible 1600 for the COLBURNS' son.

65.     After the exam, on or about March 11, 2018, Riddell returned to Tampa.

66.     On or about March 12, 2018, Dvorskiy sent the completed SAT exams, via UPS, to the College Board in New Jersey.

67.     On or about March 23, 2018, Singer caused KWF to issue a payment of $20,000 to Riddell for correcting the SAT answers for the COLBURNS' son and the other student who took the exam that same day.

68.     In or about 2018, the SAT score Riddell secretly obtained on behalf of the COLBURNS' son was submitted as part of his applications to various colleges and universities, including on or about November 6, 2018 to Texas Christian University, in Fort Worth, Texas; Indiana University, in Bloomington, Indiana; the University of Oregon, in Eugene, Oregon; and the University of Arizona, in Tucson, Arizona.

### Other Co-Conspirators

69.     In addition to the exams Singer paid Riddell to take for the children of SIDOO and the COLBURNS, Singer likewise paid Riddell to cheat on the SAT and ACT for the children of

other co-conspirators known and unknown to the Grand Jury and, in many of those instances, bribed exam administrators, including Dvorskiy, to permit Riddell to do so. As examples:

    a. In or about October 2011, Riddell provided Student 1, a high school student in Florida, with answers to her SAT subject tests while purporting to proctor Student 1's exams.

    b. On or about October 3, 2015, Riddell secretly corrected SAT answers for Student 2, a high school student in California, who later submitted those scores to Boston University, Boston College, and Northeastern University, all of which are located in the District of Massachusetts.

    c. On or about December 9, 2017, Riddell corrected SAT answers for Student 3, a high school student in California, who later submitted those scores to Northeastern University.

70.    Singer likewise bribed athletic coaches and university administrators on behalf of other co-conspirators known and unknown to the Grand Jury to designate the children of those co-conspirators as athletic recruits. As an example:

    a. Between 2012 and 2018, Singer paid Gordon Ernst, then the head coach of men's and women's tennis at Georgetown University, bribes falsely labeled as "consulting" fees totaling more than $2.7 million.

    b. Singer typically made the payments to Ernst from one of the KWF charitable accounts and sent them to Ernst via U.S. Mail, including in at least one instance to Ernst's residence in Falmouth, Massachusetts.

c. In exchange for the bribes, Ernst designated at least 12 applicants as recruits for the Georgetown tennis team, including some who did not play tennis competitively, thereby facilitating their admission to Georgetown.

### The Money Laundering Conspiracy

71.     The defendants also conspired with others known and unknown to the Grand Jury to conceal their fraud scheme by funneling bribe and other payments through the façade of a purported charitable organization, KWF, including via payments to and from accounts in the District of Massachusetts.

### Objects and Purposes of the Money Laundering Conspiracy

72.     The principal objects and purposes of the money laundering conspiracy were to conceal and disguise the nature, location, source, ownership, and control of bribe and other payments in furtherance of the fraud scheme, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

### Manner and Means of the Money Laundering Conspiracy

73.     Among the manner and means by which the defendants and others known and unknown to the Grand Jury carried out the money laundering conspiracy were the following:

a. Making purported charitable donations to KWF to fund the bribe and other payments;

b. Having KWF issue letters falsely attesting that the purported donations would help "provide educational and self-enrichment programs to disadvantaged youth," and that "no goods or services were exchanged" for the money; and

13

c. Issuing bribe and other payments in furtherance of the fraud scheme from KWF.

### Acts in Furtherance of the Money Laundering Conspiracy

74.     On various dates from in or about 2011 through in or about February 2019, the defendants and others known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the money laundering conspiracy:

75.     In or about mid-December 2017, GREGORY COLBURN initiated a transfer of stock to KWF with a value of $24,443.50, to facilitate the cheating scheme on behalf of his son.

76.     On or about December 29, 2017, KWF issued a letter to GREGORY COLBURN falsely indicating that "no goods or services were exchanged" for his purported donation of $25,000.

77.     On or about December 30, 2017, GREGORY COLBURN issued a check in the amount of $547.45 to KWF, and wrote in the memo line "charitable donation."

78.     On or about March 14, 2018, Singer caused KWF to issue a payment of $20,000 to Dvorskiy for facilitating Riddell's cheating on behalf of the COLBURNS' son and another student at the West Hollywood Test Center four days earlier.

79.     On or about October 24, 2018, Singer called the COLBURNS from Boston, Massachusetts. During the call, Singer told AMY COLBURN that the IRS "asked me about your payments for [your son] taking the test, with Mark [Riddell] at [the West Hollywood Test Center]." AMY COLBURN responded, "Okay. Is that a problem?" Singer replied, "No. So I just, I just want to-- of course, I'm not going to mention to the IRS that Mark [Riddell] took the test for [your son]." AMY COLBURN answered, "Mm-hmm." Singer then added, "So what I've stated to the IRS, [is]

that your payment went to our foundation to help underserved kids." AMY COLBURN said, "Okay."

80.     During the same call, Singer told GREGORY COLBURN, "What I'm not telling the IRS is that [your son]-- that Mark [Riddell] [inaudible] took the test for [your son] at [the West Hollywood Test Center]." GREGORY COLBURN responded, "No, I got that. Yes. No, I got that."

81.     Singer further told GREGORY COLBURN, in substance, that he had falsely told the IRS the COLBURNS' payment went to Singer's foundation to help underserved children. Singer said: "And just in case they were to call you, I just wanted to-- because I've already told them that, you know, this-- essentially, this payment was made to our foundation in lieu of, but we both know that, Mark [Riddell] took the test for [your son]. But I just wanted to make sure that we don't-- we're all on the same page." GREGORY COLBURN replied, "Right. It was to help underserved kids. . . . Got it. No problem."

## COUNT ONE
### Conspiracy to Commit Mail and Wire Fraud and Honest Services Mail and Wire Fraud
### (18 U.S.C. § 1349)

The Grand Jury charges:

82.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-81 of this Superseding Indictment.

83.     From in or about 2011 through in or about February 2019, in the District of Massachusetts and elsewhere, the defendants,

> (1) DAVID SIDOO,
> (2) GREGORY COLBURN, and
> (3) AMY COLBURN,

conspired with others known and unknown to the Grand Jury to commit the following offenses:

a.  mail fraud and honest services mail fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property, to wit, ACT and SAT tests and test scores, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive ACT, Inc. and the College Board of their right to the honest and faithful services of their test administrators through bribes and kickbacks, did, for the purpose of executing and attempting to execute the scheme, deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341 and 1346;

b.  wire fraud and honest services wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property to wit, ACT and SAT tests and test scores, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive ACT, Inc. and the College

Board of their right to the honest and faithful services of their test administrators through bribes and kickbacks, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### Money Laundering Conspiracy
### (18 U.S.C. § 1956(h))

The Grand Jury further charges:

84.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-81 of this Superseding Indictment.

85.     From in or about 2011 through in or about February 2019, in the District of Massachusetts and elsewhere, the defendants,

(2) GREGORY COLBURN and
(3) AMY COLBURN,

conspired with others known and unknown to the Grand Jury to conduct and attempt to conduct financial transactions, to wit, bribe payments and other payments funneled through a purported charitable organization, knowing that that the property involved in such transactions represented the proceeds of some form of unlawful activity and which, in fact, involved the proceeds of specified unlawful activity, that is, mail and wire fraud and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346, and knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further finds:

86.     Upon conviction of the offense in violation of Title 18, United States Code, Section 1349, set forth in Count One of this Superseding Indictment, the defendants,

(1) DAVID SIDOO,
(2) GREGORY COLBURN, and
(3) AMY COLBURN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

87.     If any of the property described in Paragraph 86, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 86 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

### MONEY LAUDERING FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(1))

The Grand Jury further finds:

88.     Upon conviction of the offense in violation of Title 18, United States Code, Section

1956(h), set forth in Count Two of this Superseding Indictment, the defendants,

(2) GREGORY COLBURN and
(3) AMY COLBURN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any

property, real or personal, involved in such offense, and any property traceable to such property.

89.     If any of the property described in Paragraph 88, above, as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of

the defendants --

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without
    difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property described in Paragraph 88 above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL,

_____
FOREPERSON

_____
ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant United States Attorneys
District of Massachusetts

District of Massachusetts: MARCH 26, 2019
Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK
3/26/19 @ 10:38am

21