UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| v. | ) | Violations: |
| | ) | |
| (1)  DAVID SIDOO, | ) | Count One: Conspiracy to Commit |
| (2)  GREGORY COLBURN, | ) | Mail and Wire Fraud and Honest |
| (3)  AMY COLBURN, | ) | Services Mail and Wire Fraud |
| (4)  GAMAL ABDELAZIZ, | ) | (18 U.S.C. § 1349) |
| (5)  DIANE BLAKE, | ) | |
| (6)  TODD BLAKE, | ) | Count Two: Money Laundering Conspiracy |
| (7)  I-HSIN "JOEY" CHEN, | ) | (18 U.S.C. § 1956(h)) |
| (8)  MOSSIMO GIANNULLI, | ) | |
| (9)  ELIZABETH HENRIQUEZ, | ) | Forfeiture Allegations: |
| (10) MANUEL HENRIQUEZ, | ) | (18 U.S.C. § 981(a)(1)(C) and |
| (11) DOUGLAS HODGE, | ) | 28 U.S.C. § 2461) |
| (12) MICHELLE JANAVS, | ) | |
| (13) ELISABETH KIMMEL, | ) | Money Laundering Forfeiture Allegations: |
| (14) LORI LOUGHLIN, | ) | (18 U.S.C. § 982(a)(1)) |
| (15) WILLIAM McGLASHAN, Jr., | ) | |
| (16) MARCI PALATELLA, | ) | |
| (17) JOHN WILSON, | ) | |
| (18) HOMAYOUN ZADEH, and | ) | |
| (19) ROBERT ZANGRILLO, | ) | |
| | ) | |
| Defendants | | |

SECOND SUPERSEDING INDICTMENT

At all times relevant to this Superseding Indictment:

General Allegations

1.      Defendant DAVID SIDOO ("SIDOO") was a resident of Vancouver, Canada.

2.      Defendant GREGORY COLBURN was a resident of Palo Alto, California.

3.      Defendant AMY COLBURN was a resident of Palo Alto, California.

4.      GREGORY COLBURN and AMY COLBURN (together, "the COLBURNS")
were a married couple.

5.     Defendant GAMAL ABDELAZIZ, also known as "Gamal Aziz," was a resident of Las Vegas, Nevada.

6.     Defendant DIANE BLAKE was a resident of Ross, California.

7.     Defendant TODD BLAKE was a resident of Ross, California.

8.     DIANE BLAKE and TODD BLAKE (together, "the BLAKES") were a married couple.

9.     Defendant I-HSIN "JOEY" CHEN was a resident of Newport Beach, California.

10.     Defendant MOSSIMO GIANNULLI was a resident of Los Angeles, California.

11.     Defendant LORI LOUGHLIN was a resident of Los Angeles, California.

12.     MOSSIMO GIANNULLI and LORI LOUGHLIN (together, "the GIANNULLIS") were a married couple.

13.     Defendant ELIZABETH HENRIQUEZ was a resident of Atherton, California.

14.     Defendant MANUEL HENRIQUEZ was a resident of Atherton, California.

15.     ELIZABETH HENRIQUEZ and MANUEL HENRIQUEZ (together, "the HENRIQUEZES") were a married couple.

16.     Defendant DOUGLAS HODGE was a resident of Laguna Beach, California.

17.     Defendant MICHELLE JANAVS ("JANAVS") was a resident of Newport Coast, California.

18.     Defendant ELISABETH KIMMEL was a resident of Las Vegas, Nevada and La Jolla, California.

19.     Defendant WILLIAM McGLASHAN, Jr. was a resident of Mill Valley, California.

20.     Defendant MARCI PALATELLA was a resident of Hillsborough, California.

21.     Defendant JOHN WILSON was a resident of Lynnfield, Massachusetts.

2

22.     Defendant HOMAYOUN ZADEH was a resident of Calabasas, California.

23.     Defendant ROBERT ZANGRILLO was a resident of Miami, Florida.

### Other Relevant Persons and Entities

24.     The Edge College & Career Network, LLC, also known as "The Key," was a for-profit college counseling and preparation business based in Newport Beach, California that was established in or about 2007 and registered in California in or about 2012.

25.     The Key Worldwide Foundation ("KWF") was a non-profit corporation founded in or about 2012 and based in Newport Beach, California. In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax, and that individuals who contributed to KWF could deduct those contributions from their taxable income, subject to certain limitations.

26.     ACT, Inc. was a non-profit organization headquartered in Iowa City, Iowa that administered the ACT, a standardized test that is widely used as part of the college admissions process in the United States.

27.     The College Board was a non-profit organization headquartered in New York, New York. Together with Educational Testing Service ("ETS"), a non-profit organization headquartered in Lawrence Township, New Jersey, the College Board developed and administered the SAT, a standardized test that, like the ACT, is widely used as part of the college admissions process in the United States. The College Board and ETS also developed and administered SAT subject tests, which are also used as part of the college admissions process.

28.     Georgetown University ("Georgetown") was a highly selective private university located in Washington, D.C.

29.     Stanford University ("Stanford") was a highly selective private university located in Palo Alto, California.

30.     The University of California at Los Angeles ("UCLA") was a highly selective public university located in Los Angeles, California.

31.     The University of Southern California ("USC") was a highly selective private university located in Los Angeles, California.

32.     The athletic teams of Georgetown, Stanford, UCLA, and USC (collectively, "the Universities") compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

33.     William "Rick" Singer was a resident, variously, of Sacramento and Newport Beach, California. Singer founded and, together with others, operated The Key and KWF.

34.     Mark Riddell was a resident of Palmetto, Florida. Riddell was employed at relevant times as the director of college entrance exam preparation at a private college preparatory school and sports academy in Bradenton, Florida.

35.     Igor Dvorskiy was a resident of Sherman Oaks, California. Dvorskiy was employed as the director of a private elementary and high school located in West Hollywood, California (the "West Hollywood Test Center"). Dvorskiy also served as a compensated standardized test administrator for ACT, Inc. and the College Board.

36.     Niki Williams was a resident of Houston, Texas. Williams was employed as an assistant teacher at a public high school in Houston (the "Houston Test Center"). Williams also served as a compensated standardized test administrator for ACT, Inc. and the College Board.

37.     Gordon Ernst was a resident of Chevy Chase, Maryland and Falmouth, Massachusetts. Until January 2018, Ernst was employed as the head coach of men's and women's tennis at Georgetown.

38.     Martin Fox was a resident of Houston, Texas. Fox was employed as the president of a private tennis academy and camp in Houston.

39.     Steven Masera was a resident of Folsom, California.   Masera was employed as an accountant and financial officer for The Key and KWF.

40.     Mikaela Sanford was a resident of Sacramento, California. Sanford was employed in various capacities for The Key and KWF.

41.     Donna Heinel was a resident of Long Beach, California. Heinel was employed as the senior associate athletic director at USC.

42.     Ali Khosroshahin was a resident of Fountain Valley, California. Until November 8, 2013, Khosroshahin was employed as the head coach of women's soccer at USC.

43.     Laura Janke was a resident of North Hollywood, California.   Janke was employed as an assistant coach of women's soccer at USC. Janke reported to Khosroshahin until his departure from the university.

44.     Jovan Vavic was a resident of Rancho Palos Verdes, California. Vavic was employed as the water polo coach at USC.

45.     Jorge Salcedo was a resident of Los Angeles, California. Salcedo was employed as the head coach of men's soccer at UCLA.

46.     John Vandemoer was a resident of Palo Alto, California. Vandemoer was employed as the head sailing coach at Stanford.

General Background on Standardized Testing and the College Admissions Process

47.     Most selective colleges and universities in the United States require prospective students to submit standardized test scores—typically, either the ACT or the SAT—as part of their application packages. When submitted, standardized test scores are a material part of the admissions process.

48.     The ACT includes sections on English, mathematics, reading, and science, and is scored on a scale of 1 to 36

49.     The SAT includes sections on writing, critical reading, and mathematics. Between 2005 and January 2016, the SAT was scored on a scale of 600 to 2400. As of March 2016, the SAT has been scored on a scale of 400 to 1600.

50.     The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits. In some instances, however, students with certain learning or other disabilities may qualify for testing accommodations, including extended time, and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by ACT, Inc. or the College Board.

51.     Compensated ACT and SAT administrators owe a duty of honest services to ACT, Inc. and/or the College Board.

52.     Prior to administering the ACT, test administrators must typically certify that they will administer the test in accordance with the ACT Administration Manual, and that they will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to ACT immediately after testing."

53.     Similarly, prior to administering the SAT, test administrators must typically certify that they will administer the test in accordance with the SAT coordinator's manual, that the SAT

6

test is the property of the College Board, and that no one other than the student can "open the test book and see the test content."

54.     The ACT tests are typically sent to and from the testing sites via Federal Express, a private, interstate commercial carrier.

55.     The SAT tests are typically sent to and from the testing sites via United Parcel Service ("UPS"), a private, interstate commercial carrier.

56.     The ACT and SAT tests, and the scores students earn on those tests, are the intellectual and physical property of ACT, Inc. and the College Board, respectively.

57.     Many selective colleges and universities in the United States, including all of the Universities, recruit students with demonstrated athletic abilities, and typically apply different criteria when evaluating applications from such students, with the expectation that recruited athletes will be contributing members of the Universities' athletic teams once enrolled. Typically, the admissions offices at the Universities allot a set number of admission slots to each head coach of a sport for that coach's recruited athletes. At each of the Universities, the admissions prospects of recruited athletes are higher—and in some cases substantially higher—than those of non-recruited athletes with similar grades and standardized test scores.

58.     University athletic coaches and administrators owe a duty of honest services to the universities where they are employed.

59.     At each of the Universities, admissions slots, the determination of which students to admit, and the resulting composition of undergraduate classes are important assets of the University.

## The Fraud Conspiracy

60.     From in or about 2011 through in or about February 2019, the defendants conspired with others known and unknown to the Grand Jury to use bribery and other forms of fraud to facilitate their children's admission to selective colleges and universities in the District of Massachusetts and elsewhere.

## Objects and Purposes of the Fraud Conspiracy

61.     The principal objects and purposes of the fraud conspiracy were to commit mail and wire fraud, and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346, by, among other things:

> a.  Cheating on college entrance exams, including in many instances by bribing exam administrators to permit such cheating;
>
> b.  Bribing university athletic coaches and administrators to designate applicants as purported athletic recruits, regardless of their athletic abilities and, in some cases, even though they did not play the sport they were purportedly recruited to play, in violation of the coaches' and administrators' duties of honest services to their employers;
>
> c.  Having a third party take classes in place of the actual students, with the understanding that grades earned in those classes would be submitted as part of the students' college applications; and
>
> d.  Submitting falsified applications for admission to universities in the District of Massachusetts and elsewhere that, among other things, included the fraudulently obtained exam scores and class grades, and often listed fake awards and athletic activities.

<u>Manner and Means of the Fraud Conspiracy</u>

62.     Among the manner and means by which the defendants and others known and unknown to the Grand Jury carried out the fraud conspiracy were the following:

a.  Seeking extended time for their children on college entrance exams, including by having the children purport to have learning disabilities in order to obtain the medical documentation that ACT, Inc. and the College Board typically require before granting students extended time;

b.  Changing the location of the exams to one of two test centers: the Houston Test Center or the West Hollywood Test Center;

c.  Bribing college entrance exam administrators at the Houston Test Center and the West Hollywood Test Center to permit cheating, in violation of their duty of honest services to ACT, Inc. and/or the College Board;

d.  Paying Riddell or another third party to pose as an ACT or SAT exam proctor, or as a student taking the exam, so that he could secretly provide students with answers during the exam, replace the students' exam responses with his own, or take the exam in place of the students;

e.  Submitting the fraudulently obtained ACT and SAT scores as part of the college admissions process, including to colleges and universities in the District of Massachusetts;

f.  Bribing athletic coaches and university administrators to designate students as purported athletic recruits or as members of other favored admissions categories;

g. Fabricating athletic "profiles" containing falsified athletic credentials—including fake honors the students purportedly received, elite athletic teams they purportedly played on, and staged photographs of the students purportedly engaged in athletic activity—to submit in support of the students' college applications; and

h. Explaining to clients and prospective clients of The Key that these fraudulent schemes were tried-and-true methods of improving exam scores and gaining admission to college that had been successfully employed by many other clients.

<u>Acts in Furtherance of the Fraud Conspiracy</u>

63.     On various dates from in or about 2011 through in or about February 2019, the defendants and others known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the fraud conspiracy:

<u>DAVID SIDOO</u>

64.     In or about the fall of 2011, SIDOO agreed with Singer to pay $100,000 to have Riddell secretly take the SAT in place of SIDOO's older son.

65.     In or about September 2011, SIDOO e-mailed Singer copies of his older son's driver's license and student identification card for the purpose of creating a falsified identification card for Riddell.

66.     Singer used the documents to obtain a falsified identification card bearing Riddell's likeness and the name of SIDOO's older son.

67.     On or about December 2, 2011, Riddell flew from Tampa, Florida to Vancouver, Canada to take the SAT in place of SIDOO's older son.

68.     In order to minimize suspicion and reduce the chance of getting caught, Singer directed Riddell not to obtain too high a score, because SIDOO's older son had previously taken the exam himself and obtained a total score of 1460 out of a possible 2400.

69.     On or about December 3, 2011, Riddell used the falsified identification card to pose as SIDOO's older son in order to secretly take the SAT in his place. Riddell earned a total score of 1670 out of a possible 2400.

70.     On or about December 23, 2011, Singer e-mailed a copy of the SAT score Riddell secretly obtained to an administrator at Chapman University, a private university in Orange, California, on behalf of SIDOO's older son.

71.     SIDOO paid Singer $100,000, as agreed, for having Riddell take the SAT for SIDOO's older son.

72.     In or about 2012, SIDOO agreed to pay Singer to have Riddell secretly take a Canadian high school graduation exam in place of SIDOO's older son.

73.     On or about May 15, 2012, Singer purchased plane tickets for Riddell to fly from Tampa to Vancouver on June 8, 2012, and to return to Tampa shortly thereafter.

74.     On or about June 9, 2012, Riddell posed as SIDOO's older son in order to secretly take the Canadian high school graduation exam in his place.

75.     In or about the fall of 2012, SIDOO agreed with Singer to pay $100,000 to have Riddell secretly take the SAT in place of SIDOO's younger son.

76.     On or about October 31, 2012, SIDOO emailed Singer a document listing his younger son's address and other biographical information for the purpose of creating a falsified identification card for Riddell.

11

77. Singer used the information to obtain a falsified identification card bearing Riddell's likeness and the name of SIDOO's younger son.

78. On or about November 22, 2012, Singer purchased a plane ticket for Riddell to fly from Tampa to Los Angeles, California on November 29, 2012, in order to take the SAT for SIDOO's younger son.

79. Singer directed Riddell to obtain a high score because SIDOO's younger son had not previously taken the SAT.

80. On or about December 1, 2012, Riddell used a falsified identification card to pose as SIDOO's younger son in order to secretly take the SAT in his place at a high school in Orange County, California. Riddell earned a total score of 2280 out of a possible 2400.

81. On or about January 21, 2013, SIDOO sent an e-mail to Singer asking for wire transfer instructions.

82. On or about January 22, 2013, an employee of The Key provided SIDOO with wire instructions for a company bank account in California.

83. On or about January 23, 2013, SIDOO wired $100,000 to the account, as agreed, for having Riddell take the SAT for SIDOO's younger son.

84. In 2013 and 2014, the SAT scores Riddell secretly obtained on behalf of SIDOO's younger son were submitted as part of his applications to colleges and universities in the United States, including on or about March 12, 2014 to Georgetown University in Washington, D.C.

85. Singer paid Riddell approximately $5,000 plus travel expenses for each of the three exams Riddell took in place of SIDOO's children.

86. On or about October 25, 2018, Singer called SIDOO from Boston, Massachusetts. During the call, SIDOO noted that his older son was applying to business school, adding, "I

thought you were gonna call me and say I got a 2100 on my GMAT"—a reference to a standardized test that is widely used as part of the business school admissions process, which is scored on a scale of 200 to 800. Singer responded, "They don't have a 2100 for the GMAT. But I would do my best to get it for ya." SIDOO replied, "I know."

### GREGORY COLBURN and AMY COLBURN

87.     In or about the fall of 2017, GREGORY COLBURN and AMY COLBURN agreed with Singer to pay $25,000 to have Riddell pose as a proctor for their son's SAT exam and secretly correct his answers.

88.     On or about October 10, 2017, AMY COLBURN e-mailed Singer that she was waiting to hear back from the College Board about whether her son would be granted extended time to take the SAT.

89.     On or about December 31, 2017, Singer e-mailed AMY COLBURN an admission ticket for the COLBURNS' son for an SAT exam with extended time to be administered on or about March 10, 2018.

90.     On or about March 9, 2018, Riddell flew from Tampa to Los Angeles to purport to proctor the SAT for the COLBURNS' son and another student who took the test at the West Hollywood Test Center that same day.

91.     Singer directed Riddell not to obtain too high a score on the COLBURNS' son's SAT, so that the child would not be alerted to the cheating on his behalf.

92.     After the students had completed the exam, Riddell reviewed and corrected their answers.

93.     Riddell earned a total score of 1190 out of a possible 1600 for the COLBURNS' son.

94.     On or about March 12, 2018, Dvorskiy sent the completed SAT exams, via UPS, to the College Board in New Jersey.

95.     On or about March 14, 2018, Singer caused KWF to issue a payment of $20,000 to Dvorskiy for facilitating Riddell's cheating on behalf of the COLBURNS' son and another student.

96.     On or about March 23, 2018, Singer caused KWF to issue a payment of $20,000 to Riddell for correcting the SAT answers for the COLBURNS' son and another student.

97.     In or about 2018, the SAT score Riddell secretly obtained on behalf of the COLBURNS' son was submitted as part of his applications to various colleges and universities.

## GAMAL ABDELAZIZ

98.     Beginning in or about the summer of 2017, GAMAL ABDELAZIZ agreed with Singer to pay an amount, ultimately totaling $300,000, for facilitating his daughter's admission to USC as a purported basketball recruit.

99.     On or about July 16, 2017, in an e-mail bearing the subject line "For Me to complete USC athletic profile," Singer asked ABDELAZIZ to send biographical information about his daughter. The e-mail indicated that the profile would include falsified honors related to basketball.

100.    On or about July 27, 2017, Singer requested that ABDELAZIZ provide an action photo of his daughter to be used in the athletic profile. ABDELAZIZ e-mailed the photo that same day.

101.    On or about August 7, 2017, Janke e-mailed Singer a draft of the profile, which falsely described ABDELAZIZ's daughter as having received numerous athletic honors. In the cover e-mail, Janke wrote: "Profile for [ABDELAZIZ's daughter]. . . . Let me know if you want me to add any other awards to her profile or if you think that is enough." Singer forwarded Janke's e-mail and false profile to ABDELAZIZ.

102.    On or about October 5, 2017, Heinel presented ABDELAZIZ's daughter to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials— obtained the subcommittee's approval to admit her to USC as a basketball recruit.

103.    On or about December 4, 2017, Heinel instructed Singer that a payment of $200,000 for ABDELAZIZ's daughter should be directed to the gift account for the Galen Center, the arena for USC's basketball and volleyball programs. Subsequently, Heinel and Singer agreed that instead of directing this money to USC, Heinel would receive payments of $20,000 per month personally in exchange for her assistance in securing the admission of ABDELAZIZ's daughter, and the children of other Singer clients, to USC as purported athletic recruits.

104.    On or about March 26, 2018, after USC mailed ABDELAZIZ's daughter a formal acceptance letter, ABDELAZIZ wired $300,000 to KWF.

105.    In or about July 2018, KWF began paying Heinel $20,000 per month in exchange for facilitating the admission of ABDELAZIZ's daughter, and the children of other Singer clients, to USC as purported athletic recruits. The payments included at least one check that Singer mailed from Massachusetts to Heinel in California on or about January 3, 2019.

106.    On or about January 3, 2019, Singer called ABDELAZIZ from Boston, Massachusetts. During the call, Singer told ABDELAZIZ, in substance, that Heinel, when asked why ADBELAZIZ's daughter was not playing basketball for USC, had responded that she had suffered an injury. ADBELAZIZ confirmed that he would provide the same cover story if questioned.

## DIANE BLAKE and TODD BLAKE

107.    Beginning in or about 2017, DIANE BLAKE and TODD BLAKE agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate their daughter's admission to USC as a purported volleyball recruit.

108.    On or about January 29, 2017, DIANE BLAKE e-mailed Singer, copying TODD BLAKE, noting that their daughter was interested in attending USC but that DIANE BLAKE assumed the school was "in the reach stretch category." Singer responded: "There is a way to garner a guarantee at USC if that is first choice but best to discuss without [your daughter] being present." DIANE BLAKE replied, copying TODD BLAKE: "Look forward to discussing."

109.    On or about June 28, 2017, DIANE BLAKE e-mailed Singer, copying TODD BLAKE: "We are fully committed to the USC plan."

110.    On or about August 7, 2017, Janke e-mailed Singer a falsified volleyball profile for the BLAKES' daughter. Approximately one week later, Singer forwarded the profile to Heinel.

111.    Heinel presented the BLAKES' daughter to the USC subcommittee for athletic admissions as a purported volleyball recruit on or about September 7, 2017.

112.    On or about September 14, 2017, Heinel e-mailed Singer a letter, addressed to the BLAKES' daughter, notifying her of her conditional admission to USC as a student athlete. Singer forwarded the letter to the BLAKES that same day. TODD BLAKE responded by thanking Singer and stating that he would register his daughter with the NCAA Eligibility Center as instructed in the letter.

113.    On or about September 16, 2017, Singer instructed TODD BLAKE to send a check for $50,000 to "USC Women's Athletics c/o Senior Women's Administrator Donna Heinel." TODD BLAKE mailed a $50,000 check to USC Women's Athletics that same day.

16

114.     On or about February 5, 2018, TODD BLAKE wired $200,000 to one of the KWF charitable accounts.

115.     In a call on or about February 22, 2019, Singer told DIANE BLAKE that USC had received a subpoena for athletic records for the past 12 years. Singer said he wanted to let DIANE BLAKE know about the subpoena "since [the BLAKES' daughter] was accepted through volleyball, but wasn't really a volleyball player in reality at [the] USC level[.]" DIANE BLAKE responded: "Yeah."

### I-HSIN "JOEY" CHEN

116.     In or about the spring of 2018, CHEN agreed with Singer to pay $75,000 to have Riddell pose as a proctor for his son's ACT exam and secretly correct his answers.

117.     On or about April 13, 2018, Riddell flew from Tampa, Florida to Los Angeles, California.

118.     The following day, CHEN's son took the ACT at the West Hollywood Test Center. Riddell purported to proctor the exam and, after CHEN's son had completed it, corrected his answers.

119.     On or about April 16, 2018, CHEN wired $75,000 to a bank account in the name of The Key. Singer caused The Key to provide CHEN with an invoice falsely indicating that the payment was for consulting services.

120.     On or about April 17, 2018, Singer caused KWF to pay Dvorskiy $20,000 for facilitating Riddell's cheating on behalf of the CHEN's son and another student.

121.     On or about April 18, 2018, Dvorskiy sent the completed exams, via Federal Express, to ACT, Inc. in Iowa City.

122.    On or about May 14, 2018, Singer caused KWF to pay Riddell $20,000 for correcting the ACT answers or CHEN's son and another student.

123.    In or about 2018, the ACT score Riddell secretly obtained on behalf of CHEN's son was submitted as part of his applications to various colleges and universities, including on or about October 8, 2018 to Emerson College in Boston, Massachusetts.

124.    On or about February 21, 2019, Singer called CHEN and asked: "[W]e both agree that Mark took the test for [your son], right?" CHEN responded: "Yeah."

### MOSSIMO GIANNULLI and LORI LOUGHLIN

125.    In or about 2016 and 2017, GIANNULLI and LOUGHLIN agreed with Singer to pay an amount, ultimately totaling $500,000, to facilitate the admission of their two daughters to USC as purported crew recruits.

126.    On or about April 22, 2016, GIANNULLI, copying LOUGHLIN, sent an e-mail to Singer, noting "I have some concerns and want to fully understand the game plan and make sure we have a roadmap for success as it relates to [our older daughter] and getting her into a school other than ASU!" Singer responded: "If you want [U]SC I have the game plan ready to go into motion. Call me to discuss."

127.    On or about September 7, 2016, GIANNULLI sent Singer an e-mail attaching a photograph of his older daughter on an ergometer.

128.    On or about October 27, 2016, Heinel presented the GIANNULLIS' older daughter to the USC subcommittee for athletic admissions, and—based on falsified athletic credentials— obtained the subcommittee's approval to admit her to USC as a crew recruit.

129.   On or about October 29, 2016, Singer e-mailed GIANNULLI: "Please send $50K payment to the person below[:] Donna Heinel, Senior Women[']s Associate Athletic Director[,] c/o of USC Athletics[.]"

130.   On or about November 1, 2016, GIANNULLI told Singer "I told biz mgr to Fed Ex [the payment] today."

131.   On or about April 10, 2017, after the GIANNULLIS' daughter received a formal acceptance letter from USC, GIANNULLI wired $200,000 to KWF.

132.   On or about July 14, 2017, Singer directed Janke to prepare a falsified crew profile for the GIANNULLIS' younger daughter.

133.   On or about July 16, 2017, Singer e-mailed GIANNULLI and LOUGHLIN requesting that they send an "action picture" for the crew profile. Singer indicated that the profile would present their younger daughter, falsely, as a crew coxswain for the L.A. Marina Club team.

134.   On or about July 28, 2017, GIANNULLI, copying LOUGHLIN, e-mailed Singer a photograph of their younger daughter on an ergometer.

135.   On or about November 2, 2017, Heinel presented the GIANNULLIS' younger daughter to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a crew recruit.

136.   On or about November 29, 2017, Singer directed the GIANNULLIS to "send a 50K check to USC and the address is below. Additionally the rest of the 200k will be paid to our foundation a 501 3C [sic] after [your younger daughter] receives his [sic] final letter in March."

137.   On or about November 30, 2017, GIANNULLI directed his business manager to send a $50,000 check to Heinel.

138.   On or about February 6, 2018, GIANNULLI wired $200,000 to KWF.

139.   On or about October 25, 2018, Singer called GIANNULLI from Boston, Massachusetts. During that call, Singer told GIANNULLI: "Donna called me couple weeks ago and says, 'Hey, uh,' you know, 'going forward, can you use the same format you used for [the GIANNULLIS' older daughter] and [their younger daughter], and the regattas that you put in there, for any girls, going forward, that don't row crew?' So it's funny how-- I thought I was just makin' stuff up." GIANNULLI replied: "Uh, right."

140.   On or about November 29, 2018, Singer called LOUGHLIN from Boston, Massachusetts. During the call, Singer said, in sum and substance, that KWF was being audited by the IRS, which was asking about the two payments of $200,000 by the GIANNULLIS. Singer added: "So I just want to make sure that you know that, one, that you're probably going to get a call and that I have not told them anything about the girls going through the side door, through crew, ever though they didn't do crew to get into USC. So I—that is—all I told them was that you guys made a donation to our foundation to help underserved kids." LOUGHLIN replied, "Um-hmm."

### ELIZABETH HENRIQUEZ and MANUEL HENRIQUEZ

141.   In or about the fall of 2015, ELIZABETH HENRIQUEZ and MANUEL HENRIQUEZ agreed to pay Singer $25,000 to have Riddell pose as a proctor for their older daughter's SAT exam and provide her with answers to the exam questions.

142.   On or about August 19, 2015, Singer e-mailed Riddell a round-trip plane ticket from Tampa, Florida to San Francisco, California. At or about the same time, Singer made arrangements for Riddell to serve as an exam proctor at the private college preparatory school in Belmont, California attended by the HENRIQUEZES' older daughter.

143.    On or about October 3, 2015, Riddell purported to proctor the SAT exam for the HENRIQUEZES' older daughter. During the exam, Riddell provided the HENRIQUEZES' daughter with answers to the questions.

144.    On or about November 24, 2015, the Henriquez Family Trust wired $15,000 to Singer's personal bank account and $10,000 to an account in the name of The Key. After receiving the funds, Singer caused KWF to pay Riddell a total of $10,000 in three separate installments.

145.    Beginning in or about 2015, the HENRIQUEZES agreed to pay Singer an amount, ultimately totaling $400,000, for their older daughter's admission to Georgetown as a purported tennis recruit.

146.    On or about August 19, 2015, Singer e-mailed ELIZABETH HENRIQUEZ and her daughter, directing the daughter to send an e-mail to Ernst, in her own name, stating, among other things: "I have been really successful this summer playing tennis around the country. I am looking forward to having a chance to be part of the Georgetown tennis team and make a positive contribution to your team's success." ELIZABETH HENRIQUEZ responded to Singer that her daughter was "on it."

147.    On or about August 20, 2015, the HENRIQUEZES' older daughter sent Singer's message to Ernst, who forwarded it to a Georgetown admissions officer.

148.    On or about October 22, 2015, the HENRIQUEZES' older daughter e-mailed Ernst her fraudulently obtained SAT scores.

149.    On or about November 6, 2015, Georgetown issued a letter to the HENRIQUEZES' older daughter indicating that the university had "conducted an initial review of [her] application to the Class of 2019 at the request of Mr. Gordie Ernst, tennis coach," and that her admission had been rated "likely."

150.    On or about May 4, 2016, the Henriquez Family Trust made a purported donation of $400,000 to KWF.

151.    On or about May 9, 2016, Singer caused a donation receipt letter to be sent to ELIZABETH HENRIQUEZ falsely stating that "no goods or serves were exchanged" for the purported donation.

152.    Between approximately September 11, 2015 and November 30, 2016, KWF paid Ernst $950,000 in exchange for Ernst's designation of the HENRIQUEZES' older daughter and several other students as purported tennis recruits.

153.    In or about the fall of 2016, the HENRIQUEZES agreed with Singer to have Riddell purport to proctor their younger daughter's ACT exam at the Houston Test Center and assist her in cheating on the exam.

154.    On or about September 13, 2016, ELIZABETH HENRIQUEZ e-mailed a counselor at her younger daughter's high school falsely stating, in substance, that her daughter wanted to take the ACT on October 22, 2016, but that "we have to be in Houston" on that date.

155.    Riddell flew from Tampa, Florida to Houston, Texas for the ACT exam, which occurred on or about October 22, 2016. Riddell purported to proctor the exam for the HENRIQUEZES' younger daughter and another student. During the exam, Riddell discussed the answers with the two students.

156.    On or about October 24, 2016, Singer paid $50,000 to Martin Fox, so that Fox, in turn, could pay Williams for facilitating Riddell's cheating.

157.    On or about October 31, 2016, Singer paid Riddell $20,000 for purporting to proctor the ACT exam for the HENRIQUEZES' younger daughter and the other student.

158.    In lieu of paying for the cheating, MANUEL HENRIQUEZ agreed to help Singer secure the admission of an applicant to Northeastern University, in Boston, Massachusetts.

159.    MANUEL HENRIQUEZ took a number of steps to facilitate the Northeastern applicant's admission, including e-mailing a senior development officer at Northeastern on or about October 26, 2016.

160.    In or about 2017, the HENRIQUEZES paid Singer at least $25,000 in cash to arrange for an individual, referred to herein as "Proctor 2," to facilitate cheating on the SAT subject tests and the ACT for their younger daughter.

161.    On or about June 3, 2017, the HENRIQUEZES' younger daughter took the SAT subject tests at the West Hollywood Test Center, with Proctor 2 purporting to proctor the tests and providing the HENRIQUEZES' younger daughter with answers to certain questions.

162.    On or about June 3, 2017, Singer mailed Proctor 2 a check for $2,000.

163.    On or about June 5, 2017, Singer mailed Dvorskiy a check for $40,000, drawn on one of the KWF charitable accounts.

164.    The following weekend, Proctor 2 purported to proctor the ACT for the HENRIQUEZES' younger daughter at the West Hollywood Test Center.

165.    After the ACT, Singer mailed Proctor 2 a check for $4,000.

166.    In or about October and November 2017, the SAT subject test scores fraudulently obtained by the HENRIQUEZES younger daughter were submitted to various colleges and universities, including, on or about October 31, 2017, to Northeastern University in Boston.

## DOUGLAS HODGE

167.    Beginning in or about the 2012, HODGE agreed to pay Singer an amount, ultimately totaling $200,000, to facilitate his younger daughter's admission to USC as a purported soccer recruit.

168.    On or about September 26, 2012, Singer forwarded high school transcripts for HODGE's younger daughter to Janke, then an assistant coach of women's soccer at USC.

169.    On or about October 15, 2012, Singer directed a payment of $50,000 from an account in the name of The Key to an account in the name of a private soccer club controlled by Khosroshahin, then the head coach of women's soccer at USC, and Janke.

170.    On or about December 16, 2012, HODGE's younger daughter's application was submitted to USC. The application included falsified soccer credentials.

171.    On or about February 12, 2013, Singer directed another $50,000 payment from an account in the name of The Key to an account in the name of a private soccer club controlled by Janke and Khosroshahin.

172.    On or about February 13, 2013, Khosroshahin e-mailed Heinel an athletic profile for HODGE'S daughter containing falsified soccer credentials.

173.    On or about February 14, 2013, Heinel presented HODGE's younger daughter to the USC subcommittee for athletic admissions, and—based on the falsified credentials provided by Khosroshahin—obtained the subcommittee's approval to admit her to USC as a soccer recruit.

174.    On or about April 9, 2013, after HODGE's younger daughter received a formal acceptance letter from USC, HODGE wired $150,000 to The Key and $50,000 to KWF.

175.    On or about May 15, 2013, Singer directed another $50,000 payment from KWF to the private soccer club controlled by Janke and Khosroshahin.

176.    Beginning in or about the 2014, HODGE agreed with Singer to pay an amount, ultimately totaling $325,000, to facilitate his son's admission to USC as a purported football recruit.

177.    On or about January 30, 2015, Singer e-mailed two falsified athletic profiles of HODGE's son created by Janke—one relating to football, the other relating to tennis—to HODGE and instructed him to e-mail them to Heinel "and ask her to use whichever one she likes." Singer added: "Obviously we have stretched the truth but this is what is done for all kids. Admissions just needs something to work with to show he is an athlete. They do not follow up after Donna presents."

178.    On or about February 12, 2015, Heinel presented HODGE's son to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit him to USC as a football recruit.

179.    On or about March 31, 2015, after HODGE'S son received a formal acceptance letter from USC, HODGE mailed Heinel a $75,000 check made payable to USC "Womens Athletic Board."

180.    On or about April 1, 2015, HODGE wired $125,000 to The Key and $125,000 to KWF.

181.    On or about April 15, 2015, Singer directed a payment of $50,000 from KWF to a bank account, controlled in part by Janke, in the name of a private soccer team.

182.    On or about November 30, 2018, Singer called HODGE from Boston, Massachusetts. During the call, Singer noted that HODGE's daughter "got in even though she wasn't a legit soccer player and [your son] not a legit-- I think we did football for [him]." HODGE responded: "Right."

## MICHELLE JANAVS

183.   Beginning in or about 2016, JANAVS agreed to pay Singer an amount, ultimately totaling $400,000, to facilitate her son's admission to Georgetown as a purported tennis recruit.

184.   On or about November 16, 2016, JANAVS's son submitted his application to Georgetown. On the same day, Singer e-mailed JANAVS: "I just spoke to Gordie and let him know."

185.   On or about December 19, 2016, Georgetown mailed JANAVS's son a conditional acceptance letter noting that "[t]he Committee on Admissions has conducted an initial review of your application to the Class of 2021 at the request of Mr. Gordie Ernst, Tennis Coach. I am pleased to report that the Committee has rated your admission as 'likely.'"

186.   On or about May 12, 2017, a foundation controlled by JANAVS's father wired $400,000 to KWF. That same day, KWF issued a letter to JANAVS falsely indicating that "no goods or services were exchanged" for the purported donation.

187.   Beginning in or about the summer of 2017, JANAVS agreed to pay Singer $50,000 to have Riddell pose as a proctor for her older daughter's ACT and secretly correct her answers.

188.   On or about August 31, 2017, JANAVS received an e-mail from ACT, Inc. with instructions on how to register her daughter to take the ACT, with extended time, at her high school. JANAVS forwarded the e-mail to Singer.

189.   On or about October 24, 2017, Dvorskiy e-mailed ACT, Inc. to change the location of the test for JANAVS's daughter to the West Hollywood Test Center.

190.   On or about October 28, 2017, after JANAVS's older daughter took the ACT at the West Hollywood Test Center, Riddell reviewed and corrected her answers.

191.    On or about October 29, 2017, Singer caused KWF to pay $18,000 to Riddell and $13,000 to Dvorskiy for facilitating the cheating for JANAVS's older daughter and another student.

192.    On or about November 1, 2017, Dvorskiy sent the completed ACT exams, via Federal Express, to ACT, Inc. in Iowa City.

193.    On or about November 30, 2017, JANAVS sent a check for $50,000 to KWF.

194.    Beginning in or about 2018, JANAVS agreed with Singer to pay an amount, ultimately totaling $200,000, to facilitate her older daughter's admission to USC as a purported volleyball recruit.

195.    On or about August 26, 2018, JANAVS e-mailed Singer photos of her older daughter playing beach and indoor volleyball.

196.    On or about October 3, 2018, Heinel presented JANAVS's older daughter's to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a volleyball recruit.

197.    On or about October 26, 2018, Singer instructed JANAVS to mail a $50,000 check to Heinel payable to the USC Women's Athletics Fund. JANAVS advised Singer that she mailed the check to Heinel that same day.

198.    Beginning in or about the fall of 2018, JANAVS agreed to pay Singer $50,000 to have Riddell pose as a proctor for her younger daughter's ACT and secretly correct her answers.

199.    On or about November 26, 2018, JANAVS called Singer to discuss the college entrance exam scheme. JANAVS said of her younger daughter: "She's smart, she's going to figure this out. Yeah, she's going to say to me-- she already thinks I'm up to, like, no good."

27

200. On or about February 5, 2019, JANAVS mailed KWF a check in the amount of $25,000.

201. On or about February 9, 2019, after JANAVS' younger daughter took the ACT at the West Hollywood Test Center, Riddell reviewed and corrected her answers.

202. On or about February 12, 2019, JANAVS wired $25,000 to a Boston, Massachusetts account in the name of KWF.

### ELISABETH KIMMEL

203. Beginning in or about 2012, KIMMEL agreed to pay Singer an amount, ultimately totaling $275,000, to facilitate her daughter's admission to Georgetown as a purported tennis recruit.

204. On or about December 20, 2012, the Georgetown admissions department sent KIMMEL's daughter a letter stating that the "Committee on Admissions ha[d] conducted an initial review of [her] application to the Class of 2017 at the request of Mr. Gordie Ernst, Tennis Coach" and "had rated [her] admission as 'likely.'"

205. On or about April 15, 2013, KIMMEL caused the Meyer Charitable Foundation, a family foundation on which KIMMEL and her spouse served as officers, to issue a check to KWF in the amount of $100,000.

206. On or about June 27, 2013, KIMMEL caused the Meyer Charitable Foundation to issue a second check to KWF in the amount of $170,000.

207. On or about July 16, 2013, KIMMEL caused the Meyer Charitable Foundation to issue a third check to KWF in the amount of $5,000.

208. Between on or about September 5, 2012 and on or about September 6, 2013, Singer caused The Key, and later KWF, to pay Ernst $244,000 in monthly installments.

209.    Beginning in or about 2017, KIMMEL agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate her son's admission to USC as a purported track and field recruit.

210.    On or about August 10, 2017, Singer directed Janke to create a falsified athletic profile for KIMMEL's son. The profile falsely described KIMMEL's son as an elite high school pole vaulter and including a photograph purporting to be of KIMMEL's son pole vaulting but which, in fact, depicted another individual.

211.    On or about October 5, 2017, Heinel presented KIMMEL's son to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit him to USC as a track and field recruit.

212.    On or about October 23, 2017, the Meyer Charitable Foundation issued a $50,000 check to the USC Women's Athletics Board. The check was signed by KIMMEL's spouse.

213.    On or about February 23, 2018, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $200,000.

214.    On or about July 26, 2018, KIMMEL and her spouse called Singer to explain that their son's advisor at USC had inquired about his status as a track athlete. KIMMEL asked Singer: "[S]o we have to hope this advisor doesn't start poking around?"

## WILLIAM McGLASHAN, Jr.

215.    In or about the fall of 2017, McGLASHAN agreed to pay Singer $50,000 to arrange for Riddell to purport to proctor his son's ACT exam and secretly correct his answers.

216.    On or about December 6, 2017, McGLASHAN made a purported donation of $50,000 to KWF from his personal charitable donation fund.

217.   On or about December 8, 2017, Riddell traveled from Tampa, Florida to Los Angeles, California to purport to proctor the ACT exam for McGLASHAN's son and two other students.

218.   On or about December 9, 2017, McGLASHAN's son took the ACT exam at the West Hollywood Test Center. After McGLASHAN's son completed the exam, Riddell corrected his answers.

219.   On or about December 13, 2017, Dvorskiy sent McGLASHAN's son's completed ACT exam, via Federal Express, to ACT, Inc. in Iowa City.

220.   On or about December 19, 2017, Singer caused KWF to pay Dvorskiy $40,000.

221.   On or about December 27, 2017, Singer caused KWF to pay Riddell $35,000.

222.   Beginning in or about the summer of 2018, McGLASHAN agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate his son's admission to USC as a purported football recruit.

223.   In a call on or about August 22, 2018, Singer told McGLASHAN that he would create a fake football profile for McGLASHAN's son, and would need "pictures of him playing multiple sports, or something where you can kind of see his face a little bit in action" so that he could "Photoshop him onto a kicker."

224.   On or about August 25, 2018, McGLASHAN sent Singer his son's fraudulently obtained ACT score, his high school transcript, and photos.

225.   On or about October 24, 2018, the ACT score Riddell secretly obtained on behalf of McGLASHAN's son was submitted as part of his applications to various colleges and universities, including Northeastern University in Boston, Massachusetts.

## MARCI PALATELLA

226.    Beginning in or about 2016, PALATELLA agreed to pay Singer $75,000 to arrange for Riddell to pose as a proctor for her son's SAT exam and secretly correct his answers. PALATELLA also agreed with Singer to pay an amount, ultimately totaling $500,000, to facilitate her son's admission to USC as a purported football recruit.

227.    On or about February 27, 2017, after her son was granted extended time on the SAT, PALATELLA e-mailed her son's high school that he would be "taking his SAT test at [the West Hollywood Test Center] in Los Angeles on March 11 and 12, 2017."

228.    On or about March 7, 2017, PALATELLA's company wired $75,000 to KWF.

229.    On or about March 8, 2017, Singer caused KWF to issue a payment of $25,000 to Dvorskiy for facilitating Riddell's cheating on behalf PALATELLA's son.

230.    On or about March 10, 2017, Riddell flew from Tampa to Los Angeles to purport to proctor the SAT for PALATELLA's son at the West Hollywood Test Center.

231.    On or about March 11, 2017, after PALATELLA's son completed the SAT exam at the West Hollywood Test Center, Riddell reviewed and corrected his answers.

232.    On or about March 13, 2017, Dvorskiy sent the completed SAT exams, via UPS, to the College Board in New Jersey.

233.    On or about March 27, 2017, Singer caused KWF to issue a payment of $10,000 to Riddell for correcting the SAT answers for PALATELLA's son.

234.    On or about July 27, 2017, PALATELLA e-mailed Singer a photo of her son in his football uniform and asked, "Will this work?" Singer forwarded the photo to Janke, together with PALATELLA's son's grades and the fraudulently obtained SAT score. Janke created an athletic profile for PALATELLA's son that included falsified football credentials.

31

235.    On or about November 16, 2017, Heinel presented PALATELLA's son to the USC subcommittee for athletic admissions, and—based on the falsified athletic credentials—obtained the subcommittee's approval to admit him to USC as a football recruit.

236.    On or about December 1, 2017, PALATELLA mailed Heinel a check in the amount of $100,000.

237.    On or about May 1, 2018—after PALATELLA's son received a formal acceptance letter from USC—PALATELLA's company wired $400,000 to KWF.

238.    On or about October 24, 2018, Singer called PALATELLA from Boston, Massachusetts. During the call, PALATELLA agreed to mislead the IRS if anyone inquired about her payments to KWF.

<u>JOHN WILSON</u>

239.    Beginning in or about 2013, WILSON agreed to pay Singer an amount, ultimately totaling $220,000, to facilitate his son's admission to USC as a purported water polo recruit. Beginning in or about 2018, WILSON agreed to pay Singer an amount, ultimately totaling $1.5 million, to facilitate his daughters' admissions to Stanford and Harvard University as purported athletic recruits.

240.    On or about February 10, 2013, WILSON e-mailed Singer and asked for the "deadline to decide on side door for USC or BC or Georgetown etc. this year" and to "confirm for which schools is side door option really viable." Singer responded that the deadline for USC and Boston College was "mid July."

241.    On or about August 24, 2013, WILSON e-mailed Singer about the timing of his payments to Vavic, the USC water polo coach, to secure his son's admission as a purported water

polo recruit. WILSON wrote: "What does Jovan need by [S]ept 20? Do u have what we need? Do I make the first payment to u then?"

242.    On or about October 3, 2013, Vavic advised Singer that he needed an athletic profile for WILSON's son and that it "needs to be a good resume." Singer subsequently provided Vavic with a falsified profile that included fabricated swimming times and awards.

243.    On or about February 26, 2014, Vavic e-mailed a USC athletics administrator that WILSON's son "would be the fastest player on our team, he swims 50 y in 20 [seconds], my fastest players are around 22 [seconds], this kid can fly."

244.    On or about February 28, 2014, the USC subcommittee for athletic admissions approved the admission of WILSON's son as a water polo recruit based on the falsified athletic credentials.

245.    On or about March 1, 2014, WILSON e-mailed Singer under the subject line "USC fees." WILSON wrote:

> Thanks again for making this happen! Pls give me the invoice. What are the options for the payment? Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?

Singer replied that he could make the invoice for business consulting fees, so that WILSON could "write [it] off as an expense."

246.    On or about April 7, 2014, after USC mailed WILSON's son a formal acceptance letter, WILSON's company wired a total of $220,000 to Singer, including $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer directly.

247.    On or about April 16, 2014, Singer withdrew a $100,000 cashier's check, made out to "USC Men's Water Polo," from The Key's account. The "Purpose/Remitter" identified on the check was "Wilson Family."

248.    On or about September 29, 2018, WILSON asked Singer about "side door" opportunities for his daughters. During this call, Singer explained, in sum and substance, that "by the side door" he may be able to tell the sailing coach: "'Hey, this family's willing to make the contributions. She could be on your team. She is a sailor. She may not be up to the level you are, but she can con-- you know, you're gonna get a benefit, and the family's gonna get benefit.'"

249.    On or about October 15, 2018, Singer called WILSON to discuss various "side door" options for WILSON's daughters and noted that for any of those options, WILSON's daughters "don't have to play. They just-- that's the path I'm gonna get 'em in on." WILSON responded: "Gotcha."

250.    On or about October 17, 2018, WILSON's company wired $500,000 to an account in the name of KWF in the District of Massachusetts.

251.    On or about October 27, 2018, Singer told WILSON that he had secured a "side door" deal for one of WILSON's daughters with the Stanford sailing coach, John Vandemoer, and that the deal with Vandemoer was hidden from Stanford.

252.    On or about November 29, 2018, Singer told WILSON that he had secured an admissions spot at Harvard through a fictitious "senior women's administrator," and that, in exchange for an initial $500,000 payment to her, as well as a subsequent payment, the administrator would designate one of WILSON's daughters as an athletic recruit.

253.    On or about December 11, 2018, WILSON's company wired another $500,000 to the Massachusetts account in the name of KWF.

<u>HOMAYOUN ZADEH</u>

254.    Beginning in or about 2016, Zadeh agreed with Singer to pay an amount, ultimately totaling $150,000, to facilitate his daughter's admission to USC as a purported lacrosse recruit.

255.    On or about December 16, 2016, ZADEH provided Singer with a photograph of his daughter cheerleading. Singer forwarded the photograph to Janke and directed her to fabricate a lacrosse profile for ZADEH's daughter.

256.    On or about March 15, 2017, Heinel present ZADEH's daughter to the USC subcommittee for athletic admissions, and—based on falsified athletic credentials—obtained the subcommittee's approval to admit her to USC as a lacrosse recruit.

257.    In a text message on or about March 20, 2017, ZADEH told Singer that his daughter was concerned that "she did not get in on her own merits. I have not shared anything about our arrangement but she somehow senses it."

258.    During the same text exchange, Singer told ZADEH that he could "make the 100k payment over the next 6 months starting April 1st. You can send to my foundation as a donation/write off or if you have your own company we can invoice you as a business consulting fee from our profit business and you write off as an expense."

259.    On or about March 27, 2017, after USC mailed ZADEH's daughter her formal acceptance letter, KWF sent $50,000 to the USC Women's Athletics Board.

260.    Between May 30, 2017 and September 7, 2018, ZADEH made the following payments to KWF:

| Date Posted to KWF Account | Amount |
|---|---|
| 5/30/2017 | $5,000 |
| 9/25/2017 | $10,000 |
| 10/23/2017 | $10,000 |
| 12/27/2017 | $10,000 |
| 2/15/2018 | $5,000 |
| 3/26/2018 | $5,000 |
| 4/27/2018 | $5,000 |
| 9/7/2018 | $5,000 |

261.    On or about October 25, 2018, Singer called ZADEH from Boston, Massachusetts. During the call, Singer told ZADEH, in sum and substance, that KWF was being audited by the IRS. Singer said: "I'm not going to tell the IRS that we got [your daughter] in through lacrosse." ZADEH responded: "Right." Singer continued: "And Donna Heinel at USC." ZADEH replied: "Right." Singer also said: "[Y]ou know, we created a profile that wasn't real." ZADEH responded: "Right."

ROBERT ZANGRILLO

262.    Beginning in or about 2018, ZANGRILLO agreed with Singer to pay an amount, ultimately totaling $250,000, to facilitate his daughter's transfer to USC as a purported crew recruit.

263.    On or about February 1, 2018, ZANGRILLO's daughter's transfer application was submitted to USC. The application included falsified athletic credentials.

264.    In a call with ZANGRILLO, ZANGRILLO's daughter and Sanford, on or about June 11, 2018, Singer explained, in sum and substance, that he had asked members of the USC athletics department to facilitate ZANGRILLO's daughter's admission "as though she's been sculling and rowing," and that the crew coach had agreed to designate her as a purported crew recruit, provided that "[y]ou guys help us."

265.    During the same call, ZANGRILLO directed Sanford to take a biology and an art history class for his daughter.

266.    On or about September 20, 2018, after USC mailed ZANGRILLO's daughter an acceptance letter, ZANGRILLO wired $200,000 to one of the KWF charitable accounts.

267.    On or about that same day, ZANGRILLO mailed a check in the amount of $50,000 to "USC Women's Athletics."

268.    In a call with Singer on or about January 3, 2019, ZANGRILLO confirmed that his

daughter would not say anything to her USC advisor about being admitted through athletics.

### Other Co-Conspirators

269.    In addition to the exams Singer paid Riddell to take for the children of the

defendants, Singer likewise paid Riddell to cheat on the SAT and ACT for the children of other

co-conspirators known and unknown to the Grand Jury and, in many of those instances, bribed

exam administrators, including Dvorskiy and Williams, to permit Riddell to do so.

270.    Singer likewise bribed athletic coaches and university administrators on behalf of

other co-conspirators known and unknown to the Grand Jury to designate the children of those co-

conspirators as athletic recruits.

### The Money Laundering Conspiracy

271.    The defendants also conspired with others known and unknown to the Grand Jury

to conceal their fraud scheme by funneling bribe and other payments through the façade of The

Key or KWF, including via payments to and from accounts in the District of Massachusetts, and

to promote their fraud scheme via payments to The Key and KWF from outside the United States.

### Objects and Purposes of the Money Laundering Conspiracy

272.    The principal objects and purposes of the money laundering conspiracy were: (a)

to conceal and disguise the nature, location, source, ownership, and control of bribe and other

payments in furtherance of the fraud scheme, in violation of Title 18, United States Code, Section

1956(a)(1)(B)(i); and, (b) to transport, transmit, and transfer funds to a place in the United States

from and through a place outside the United States, with the intent to promote the fraud scheme, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

<u>Manner and Means of the Money Laundering Conspiracy</u>

273.    Among the manner and means by which the defendants and others known and unknown to the Grand Jury carried out the money laundering conspiracy were the following:

a.   Making purported charitable donations to KWF or payments to The Key to fund the bribe and other payments in furtherance of the fraud scheme;

b.   Having KWF issue letters falsely attesting that the purported donations would help "provide educational and self-enrichment programs to disadvantaged youth," and that "no goods or services were exchanged" for the money;

c.   Having The Key issue falsified "consulting" agreements and invoices stating that payments made in furtherance of the fraud scheme were instead for legitimate services; and

d.   Issuing bribe and other payments in furtherance of the fraud scheme from accounts in the name of The Key and KWF.

<u>Acts in Furtherance of the Money Laundering Conspiracy</u>

274.    On various dates from in or about 2011 through in or about February 2019, the defendants and others known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the money laundering conspiracy:

## DAVID SIDOO

275.    On or about January 23, 2013, SIDOO wired $100,000 from an account in Canada to an account in California in the name of The Key, in exchange for Singer's facilitation of the SAT cheating scheme for SIDOO's younger son.

## GREGORY COLBURN and AMY COLBURN

276.    In or about December 2017, GREGORY COLBURN initiated a transfer of stock to KWF with a value of $24,443.50, in exchange for Singer's facilitation of the SAT cheating scheme for the COLBURNS' son.

277.    GREGORY COLBURN subsequently issued a check in the amount of $547.45 to KWF, and wrote "charitable donation" in the memo line.

278.    On or about December 29, 2017, KWF issued a letter to GREGORY COLBURN falsely indicating that "no goods or services were exchanged" for the purported donation.

279.    In a call on or about October 24, 2018, Singer told AMY COLBURN, "So what I've stated to the IRS, [is] that your payment went to our foundation to help underserved kids." AMY COLBURN responded, "Okay." During the same call, Singer told GREGORY COLBURN, "I just wanted to make sure that we don't-- we're all on the same page." GREGORY COLBURN replied, "Right. It was to help underserved kids. . . . Got it. No problem."

## GAMAL ABDELAZIZ

280.    On or about March 26, 2018, ABDELAZIZ wired a payment of $300,000 to KWF in exchange for Singer's facilitation of his daughter's admission to USC as a purported basketball recruit.

281.    On or about March 26, 2018, KWF issued a letter to ABDELAZIZ falsely indicating that "no goods or services were exchanged" for the purported donation.

## DIANE BLAKE and TODD BLAKE

282.    On or about September 16, 2017, TODD BLAKE mailed a $50,000 check to Heinel, payable to USC Women's Athletics, in exchange for facilitating his daughter's admission as a purported volleyball recruit.

283.    On or about February 5, 2018, TODD BLAKE wired $200,000 to one of the KWF charitable accounts, in exchange for Singer facilitating his daughter's admission to USC as a purported volleyball recruit.

284.    In call on or about October 25, 2018, TODD BLAKE asked Singer: "[W]ill I get contacted [by the IRS], and if so how would you like me to answer?" Singer responded: "[W]hat I want you to say is that your money went to our foundation, which it did." TODD BLAKE replied: "Yeah. Okay." Singer then said, "You made a donation to help underserved kids." TODD BLAKE responded: "Right. Okay, good."

285.    In a call on or about February 22, 2019, Singer told DIANE BLAKE, in reference to her daughter's acceptance to USC, "but [your daughter] got in with you guys making a payment, you know for $50,000 to USC women's athletics directly and then $200[,000] to my foundation." DIANE BLAKE responded "right," and further acknowledged that "that was the payment to get her in."

## I-HSIN "JOEY" CHEN

286.    On or about April 16, 2018, CHEN wired $75,000 to The Key in exchange for Singer arranging the ACT cheating scheme on behalf of his son.

287.    Singer caused The Key to provide CHEN with an invoice falsely indicating that the payment was for consulting services.

40

## MOSSIMO GIANNULLI and LORI LOUGHLIN

288.    On or about April 10, 2017, GIANNULLI wired $200,000 to KWF in exchange for Singer facilitating his older daughter's admission to USC as a purported crew recruit.

289.    On or about March 26, 2018, KWF issued a letter to GIANNULLI and LOUGHLIN falsely indicating that "no goods or services were exchanged" for the purported donation of $200,000.

290.    On or about February 6, 2018, GIANNULLI wired $200,000 to KWF in exchange for Singer facilitating his younger daughter's admission to USC as a purported crew recruit.

291.    On or about February 7, 2018, KWF issued a letter to the GIANNULLIS falsely indicating that "no goods or services were exchanged" for the purported donation of $200,000.

## ELIZABETH HENRIQUEZ and MANUEL HENRIQUEZ

292.    On or about May 4, 2016, the Henriquez Family Trust sent $400,000 to KWF in exchange for Singer facilitating the HENRIQUEZES' older daughter's admission to Georgetown as a purported tennis recruit.

293.    On or about May 9, 2016, Singer caused KWF to send a receipt letter to ELIZABETH HENRIQUEZ falsely stating that "no goods or serves were exchanged" for the purported donation.

294.    On or about October 24, 2018, Singer called ELIZABETH HENRIQUEZ from Boston, Massachusetts. During the call, Singer told ELIZABETH HENRIQUEZ that the IRS was conducting an audit of KWF and had asked about "the large sums of money" from the HENRIQUEZES.   ELIZABETH HENRIQUEZ asked: "So what's your story?" Singer responded: "So my story is, essentially, that you gave your money to our foundation to help underserved kids." ELIZABETH HENRIQUEZ responded: "Of course."

41

## DOUGLAS HODGE

295.    On or about April 9, 2013, HODGE wired $50,000 to KWF in exchange for Singer facilitating his daughter's admission to USC as a purported soccer recruit.

296.    On or about April 10, 2013, KWF issued a letter to HODGE falsely indicating that "no goods or services were exchanged" for the purported donation.

297.    On or about April 1, 2015, HODGE wired $125,000 to KWF and $125,000 to The Key in exchange for Singer facilitating his son's admission to USC as a purported football recruit.

298.    On or about April 10, 2015, KWF issued a letter to HODGE falsely representing that "no goods or services were exchanged" for his purported contribution of $125,000.

## MICHELLE JANAVS

299.    On or about May 12, 2017, a foundation controlled by JANAVS's father wired $400,000 to KWF in exchange for Singer facilitating JANAVS's son's admission to Georgetown as a purported tennis recruit.

300.    On or about May 12, 2017, KWF issued a letter to JANAVS falsely indicating that "no goods or services were exchanged" for the purported donation of $400,000.

301.    On or about November 30, 2017, JANAVS sent a check for $50,000 from her foundation to KWF in exchange for Singer facilitating cheating for JANAVS's older daughter on the ACT.

302.    On or about February 5, 2019, JANAVS mailed KWF a check in the amount of $25,000 for facilitating the ACT cheating scheme for JANAVS's younger daughter.

303.    On or about February 12, 2019, JANAVS wired $25,000 to a Boston, Massachusetts account in the name of KWF as further payment for Singer facilitating the ACT cheating scheme for JANAVS's younger daughter.

## ELIZABETH KIMMEL

304.    On or about April 15, 2013, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $100,000 in exchange for Singer facilitating her daughter's admission to Georgetown as a purported tennis recruit.

305.    Masera thereafter sent a letter to the Meyer Charitable Foundation falsely indicating that "no goods or services were exchanged" for the purported donation.

306.    On or about June 27, 2013, and on or about July 16, 2013, KIMMEL caused the Meyer Charitable Foundation to issue additional checks to KWF in the amounts of $170,000 and $5,000, respectively as further payment for the recruitment scheme.

307.    On or about February 23, 2018, KIMMEL caused the Meyer Charitable Foundation to issue a check to KWF in the amount of $200,000 in exchange for Singer facilitating her son's admission to USC as a purported track and field recruit.

## WILLIAM McGLASHAN, Jr.

308.    On or about December 6, 2017, McGLASHAN sent $50,000 to KWF from his personal charitable donation fund in exchange for Singer facilitating the ACT cheating scheme for McGLASHAN's son.

## MARCI PALATELLA

309.    On or about March 7, 2017, PALATELLA's company wired $75,000 to KWF in exchange for Singer facilitating the SAT cheating scheme for PALATELLA's son.

310.    On or about May 1, 2018, PALATELLA's company wired $400,000 to KWF in exchange for Singer facilitating her son's admission to USC as a purported football recruit.

## JOHN WILSON

311.    On or about March 1, 2014, WILSON asked Singer, in substance, whether he could pay Singer from his corporate account for facilitating WILSON's son's admission to USC as a water polo recruit, so that the payment would be deductible as a purported consulting fee.

312.    On or about April 7, 2014, WILSON's company wired $100,000 to KWF, $100,000 to The Key, and $20,000 to Singer personally.

313.    On or about July 28, 2014, USC sent WILSON and his spouse a gift receipt for their purported $100,000 charitable contribution to USC Athletics, which was, in fact, a payment in exchange for facilitating their son's admission as a purported athletic recruit.

## HOMAYOUN ZADEH

314.    On or about April 5, 2017, Masera e-mailed an invoice to ZADEH and his spouse for their purported "pledge" of $100,000, which was in fact a payment for facilitating ZADEH's daughter's admission to USC as a purported lacrosse recruit.

315.    Between on or about May 30, 2017 and September 7, 2018, ZADEH made eight payments totaling $55,000 to KWF.

316.    On or about December 27, 2017, KWF issued a letter to ZADEH and his spouse falsely attesting that "no goods or services were exchanged" for their donations.

317.    On or about March 6, 2019, ZADEH's spouse e-mailed Singer, copying ZADEH, noting that she had sent an additional $5,000 to KWF and requesting a tax receipt for the money ZADEH and his spouse had purportedly contributed to KWF in 2018.

## ROBERT ZANGRILLO

318.     On or about September 20, 2018, ZANGRILLO wired $200,000 to one of the KWF charitable accounts in exchange for Singer facilitating his daughter's admission to USC as a purported crew recruit.

319.     In a call from Boston, Massachusetts on or about October 25, 2018, Singer told ZANGRILLO, in sum and substance, that the IRS was auditing KWF.   ZANGRILLO asked: "What was [my daughter's] payment for? Just so I know, so we have the story straight." Singer responded, in substance, that the payments would appear to be "for our programs that handle underserved kids." ZANGRILLO replied: "Okay, great, perfect."

### Other Co-Conspirators

320.     Singer likewise funneled bribes through KWF and The Key to athletic coaches and university administrators in the District of Massachusetts and elsewhere, on behalf of other co-conspirators known and unknown to the Grand Jury, in order to conceal and disguise the nature, location, source, ownership, and control of bribe and other payments in furtherance of the fraud scheme.

321.     Other co-conspirators known and unknown to the Grand Jury also transported, transmitted, and transferred monetary instruments and funds from a place outside the United States to and through KWF and The Key accounts inside the United States in furtherance of the fraud scheme.

COUNT ONE
Conspiracy to Commit Mail and Wire Fraud
and Honest Services Mail and Wire Fraud
(18 U.S.C. § 1349)

The Grand Jury charges:

322.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-270 of this Second Superseding Indictment.

323.    From in or about 2011 through in or about February 2019, in the District of Massachusetts and elsewhere, the defendants,

    (1)    DAVID SIDOO,
    (2)    GREGORY COLBURN,
    (3)    AMY COLBURN,
    (4)    GAMAL ABDELAZIZ,
    (5)    DIANE BLAKE,
    (6)    TODD BLAKE,
    (7)    I-HSIN "JOEY" CHEN,
    (8)    MOSSIMO GIANNULLI,
    (9)    ELIZABETH HENRIQUEZ,
    (10)    MANUEL HENRIQUEZ,
    (11)    DOUGLAS HODGE,
    (12)    MICHELLE JANAVS,
    (13)    ELISABETH KIMMEL,
    (14)    LORI LOUGHLIN,
    (15)    WILLIAM McGLASHAN, Jr.,
    (16)    MARCI PALATELLA,
    (17)    JOHN WILSON,
    (18)    HOMAYOUN ZADEH, and
    (19)    ROBERT ZANGRILLO,

conspired with others known and unknown to the Grand Jury to commit the following offenses:

a.  mail fraud and honest services mail fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property, to wit, ACT and SAT tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities of their right to

the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did, for the purpose of executing and attempting to execute the scheme, deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341 and 1346;

b.  wire fraud and honest services wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property to wit, ACT and SAT tests and test scores, and admission to the Universities, by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive, variously, ACT, Inc., the College Board, and the Universities, of their right to the honest and faithful services of their test administrators, athletic coaches and university administrators, through bribes and kickbacks, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

All in violation of Title 18, United States Code, Section 1349.

COUNT TWO
Money Laundering Conspiracy
(18 U.S.C. § 1956(h))

The Grand Jury further charges:

324.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-321 of this

Second Superseding Indictment.

325.    From in or about 2011 through in or about February 2019, in the District of

Massachusetts and elsewhere, the defendants,

(1)    DAVID SIDOO,
(2)    GREGORY COLBURN,
(3)    AMY COLBURN,
(4)    GAMAL ABDELAZIZ,
(5)    DIANE BLAKE,
(6)    TODD BLAKE,
(7)    I-HSIN "JOEY" CHEN,
(8)    MOSSIMO GIANNULLI,
(9)    ELIZABETH HENRIQUEZ,
(10)   MANUEL HENRIQUEZ,
(11)   DOUGLAS HODGE,
(12)   MICHELLE JANAVS,
(13)   ELISABETH KIMMEL,
(14)   LORI LOUGHLIN,
(15)   WILLIAM McGLASHAN, Jr.,
(16)   MARCI PALATELLA,
(17)   JOHN WILSON,
(18)   HOMAYOUN ZADEH, and
(19)   ROBERT ZANGRILLO,

conspired with others known and unknown to the Grand Jury to commit the following offenses:

a.  to conduct and attempt to conduct financial transactions, to wit, bribe payments and

other payments funneled through a purported charitable organization and a for-profit

corporation, knowing that that the property involved in such transactions represented

the proceeds of some form of unlawful activity and which, in fact, involved the

proceeds of specified unlawful activity, that is, mail and wire fraud and honest services

mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346, and knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i);

b.   to transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds, to wit, bribes and other payments, to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, mail and wire fraud and honest services mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343 and 1346, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

All in violation of Title 18, United States Code, Section 1956(h).

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

The Grand Jury further finds:

326.    Upon conviction of the offense in violation of Title 18, United States Code, Section

1349, set forth in Count One of this Second Superseding Indictment, the defendants,

    (1)    DAVID SIDOO,
    (2)    GREGORY COLBURN,
    (3)    AMY COLBURN,
    (4)    GAMAL ABDELAZIZ,
    (5)    DIANE BLAKE,
    (6)    TODD BLAKE,
    (7)    I-HSIN "JOEY" CHEN,
    (8)    MOSSIMO GIANNULLI,
    (9)    ELIZABETH HENRIQUEZ,
    (10)    MANUEL HENRIQUEZ,
    (11)    DOUGLAS HODGE,
    (12)    MICHELLE JANAVS,
    (13)    ELISABETH KIMMEL,
    (14)    LORI LOUGHLIN,
    (15)    WILLIAM McGLASHAN, Jr.,
    (16)    MARCI PALATELLA,
    (17)    JOHN WILSON,
    (18)    HOMAYOUN ZADEH, and
    (19)    ROBERT ZANGRILLO,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),
and Title 28, United States Code, Section 2461(c), any property, real or personal, which
constitutes or is derived from proceeds traceable to the offense.

327.    If any of the property described in Paragraph 326, above, as being forfeitable
pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,
Section 2461(c), as a result of any act or omission of the defendants --

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 326 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

## MONEY LAUDERING FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(1))

The Grand Jury further finds:

328.    Upon conviction of the offense in violation of Title 18, United States Code, Section

1956(h), set forth in Count Two of this Second Superseding Indictment, the defendants,

     (1) DAVID SIDOO,
     (2) GREGORY COLBURN,
     (3) AMY COLBURN,
     (4) GAMAL ABDELAZIZ,
     (5) DIANE BLAKE,
     (6) TODD BLAKE,
     (7) I-HSIN "JOEY" CHEN,
     (8) MOSSIMO GIANNULLI,
     (9) ELIZABETH HENRIQUEZ,
     (10) MANUEL HENRIQUEZ,
     (11) DOUGLAS HODGE,
     (12) MICHELLE JANAVS,
     (13) ELISABETH KIMMEL,
     (14) LORI LOUGHLIN,
     (15) WILLIAM McGLASHAN, Jr.,
     (16) MARCI PALATELLA,
     (17) JOHN WILSON,
     (18) HOMAYOUN ZADEH, and
     (19) ROBERT ZANGRILLO,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any

property, real or personal, involved in such offense, and any property traceable to such property.

329.    If any of the property described in Paragraph 328, above, as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of

the defendants --

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property described in Paragraph 328 above.

    All pursuant to Title 18, United States Code, Section 982(a)(1).


A TRUE BILL,

FOREPERSON


ERIC S. ROSEN
JUSTIN D. O'CONNELL
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
Assistant United States Attorneys
District of Massachusetts


District of Massachusetts: APRIL 9, 2019
Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

12:57 pm
4/9/19