UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 19-10080-NMG |
| | ) | |
| DAVID SIDOO, *et. al.*, | ) | **Leave to File Excess Pages** |
| | ) | **Granted April 8, 2020** |
| | ) | |
| Defendants | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS INDICTMENT OR, IN THE ALTERNATIVE, FOR SUPPRESSION OF
<u>EVIDENCE AND FOR DISCOVERY AND AN EVIDENTIARY HEARING</u>**

## **TABLE OF CONTENTS**

INTRODUCTION……………………………………………………………………...1

  I.   RELEVANT FACTUAL BACKGROUND…………………………………………….2

      A.  The Charges..................................................................................................... 2

      B.  The Initial Investigation ................................................................................. 3

      C.  The Approach of Rick Singer......................................................................... 9

      D.   The Consensual Wiretap ............................................................................. 10

      E.  The Consensual Search of Singer's Phone ................................................. 14

      F.  Deleted Text Messages ................................................................................ 17

      G.  Discovery Disputes...................................................................................... 18

      H.  Status Reports and Status Conferences ....................................................... 19

      I.  The February 26 Disclosure ........................................................................ 21

  II.   ARGUMENT…………………………………………………………………….22

      A.  There Is No Basis for the Drastic Sanction of Dismissing an Indictment .................. 24

      B.  The Consensual Recordings Were Not Tainted and Should Not Be Suppressed........ 30

      C.  The Defendants Are Not Entitled to an Evidentiary Hearing...................................... 32

CONCLUSION……………………………………………………………………..…34

## INTRODUCTION

On February 26, 2020, the government produced approximately 47 pages of notes taken by a cooperating witness, William "Rick" Singer, on his iPhone, including several pages of notes Singer drafted for his attorney in the days after he was first approached by government agents. The production came before the Court set a trial date in this case, and nearly eight months before the date it ultimately set.

The government should have produced the notes earlier, under the applicable deadline set by the Local Rules.  But the defendants' contention that the government acted in bad faith is baseless; in a sprawling, fast-moving prosecution, the failure to produce the notes earlier was simply a mistake.  The defendants have suffered no prejudice, and their suggestion that the notes somehow "exonerate" them, or reveal that the evidence against them was fabricated, is demonstrably false.  The defendants' criminal intent is plain from evidence of their actions, and their interactions with Singer, *before* he began cooperating – and that evidence corroborates, and is corroborated by, evidence the government gathered afterwards.

The defendants' core allegations of misconduct are premised on a straw man:  that this case is only about bribery.  It is not.  The defendants are charged with conspiring to engage in a single, sweeping scheme to gain admission for their children to college by, among other things, lying about their academic and athletic qualifications so that complicit coaches, induced by bribes styled as "donations" to their programs, could purport to recruit them as elite athletes.  The defendants' brief, despite its comprehensive catalogue of alleged government misconduct, tries to sanitize their actions by ignoring any mention of the larger fraud scheme within which the alleged bribery occurred.  But their claims, and the evidence in this case, must be viewed in the context of the actual indictment, not the imaginary one they would prefer to fight.

Against that backdrop, and the procedural history of this case, the defendants' allegations of bad faith, misrepresentations to the Court, tainted evidence, and failure to investigate, emerge as the smokescreen they really are. Their motion, which seeks unprecedented relief that is contrary to the well-established law of this Circuit, should be denied. And because they identify no disputed facts material to a decision on the relief they seek, their request for an evidentiary hearing should likewise be denied.

## I.   **RELEVANT FACTUAL BACKGROUND**

### A.  The Charges

The defendants are charged with conspiring to secure the admission of their children to selective colleges by fabricating academic and athletic credentials, falsifying applications, cheating on standardized tests using payoffs to corrupt proctors and test center administrators, paying others to take classes in their stead, and bribing corrupt university employees to recruit their children to Division I athletic teams based on athletic resumes that were either grossly exaggerated or invented out of whole cloth.[1]  *See* Fourth Superseding Indictment ("Indictment"), Dkt. 732. In particular, as relevant to this motion, the Indictment alleges that:

- one of the principal purposes of the scheme was "securing the admission of the defendants' children to selective colleges using fraudulently obtained test scores, bogus academic and athletic credentials, falsified applications, and bribes"; Dkt. 732 ¶ 65.

- another purpose of the scheme was "funding designated university accounts over which the bribe recipients exercised discretion or that otherwise benefited them professionally," *id*.;

- in furtherance of the conspiracy, the defendants directed payments to Singer's purported charity, the Key Worldwide Foundation ("KWF"), and/or to specific

---

[1] The defendants are also charged with conspiring to commit money laundering. Eleven of the 15 defendants are charged with conspiring to commit federal programs bribery. Four are charged with substantive counts of federal programs bribery, wire fraud and honest services wire fraud, and one, John Wilson, is charged with a substantive count of filing a false tax return.

university athletic programs, in some cases mailing the payments directly to complicit university insiders;[2] and

- in exchange for those payments, complicit insiders recruited the defendants' children to their schools as purported athletes with little or no regard for their athletic qualifications, and complicit proctors corrected their exam answers, or gave them answers, even as complicit test administrators allowed the cheating to occur, *see, e.g.*, Dkt. 732 ¶¶ 66(c), (d) and (f).

B.  The Initial Investigation

The charges arose out of an investigation that involved multiple cooperating witnesses, Court-authorized email searches, and a Title III wiretap that began in June 2018 and spanned four months.  This evidence makes clear that – well before the government decided to seek Singer's cooperation – the defendants agreed to fabricate athletic credentials for their children (most of whom did not play competitive sports) and then make payments, styled as "donations," (1) to designated college athletic programs, with the understanding that the coaches or administrators would, in exchange, guarantee their children's admission as fake athletic recruits; and/or (2) to Singer's purported charity, KWF, with the understanding that Singer would pass at least some of that money on as directed by corrupt university insiders, or use it to pay off complicit proctors and test administrators.  For instance:

1.  Defendant William McGlashan

- McGlashan engaged Singer to provide counseling services for his children in or about April 2017.  After arranging for his son to take the ACT exam with extended time at Singer's corrupt test center in West Hollywood, California (hundreds of miles away), instead of at

---

[2] *See, e.g.*, Dkt. 732 at ¶ 129 ("On or about September 16, 2017, Singer instructed TODD BLAKE to send a check for $50,000 to "USC Women's Athletics c/o Senior Women's Administrator Donna Heinel."); ¶ 149 ("On or about October 29, 2016, Singer emailed GIANNULLI: 'Please send $50K payment to the person below[:] Donna Heinel, Senior Women[']s Associate Athletic Director[,] c/o of USC Athletics[.]'"); ¶ 179 ("On or about October 23, 2017, the Meyer Charitable Foundation issued a $50,000 check to the USC Women's Athletics Board.  The check was signed by KIMMEL's spouse."); ¶ 221 ("On or about December 1, 2017, PALATELLA mailed Heinel a check in the amount of $100,000, made payable to USC Women's Athletic Board."); ¶ 273 ("On or about that same day, ZANGRILLO caused a check in the amount of $50,000 to be issued to 'USC Women's Athletics.'").

3

his own high school – McGlashan flew to Los Angeles with his son for the exam. *See* Ex. A [Oct. 21, 2017 email chain]; Ex. B [Nov. 20, 2017 email chain]; Ex. C [flight records from Dec. 8 and 9, 2017]. McGlashan directed his assistant by email to book a hotel room for just one night and to "make sure they fedexed the check to Key Foundation." *See* Ex. D [Dec. 4, 2017 email chain].

- McGlashan then sent a text message to Singer: "Can you send me details where I send the 50 payment and who I make it out to etc?" *See* Ex. E [Nov. 30, 2017 text messages]. That same day, Singer's bookkeeper emailed McGlashan a $50,000 invoice from KWF for payment "Regarding West Hollywood College Prep." *See* Ex. F [Nov. 30, 2017 invoice]. McGlashan made the payment from his donor-advised charitable fund. *See* Ex. G [McGlashan check]. On December 9, the corrupt proctor corrected McGlashan's son's exam answers. *See, e.g.*, Ex. H at 17 [Apr. 12, 2019 plea transcript]. Singer then issued payments from KWF to the corrupt proctor and to a corporate account controlled by the corrupt test administrator. *See* Ex. I [payments].

- Eight months later, during a July 30, 2018 call that was intercepted pursuant to a Court-authorized wiretap, McGlashan inquired about the mechanics of pursuing the test cheating again, this time for his younger son and his daughter. Singer explained that if a doctor could "come up with stuff" to secure extended time on the exam, "then I can control the center." *See* Ex. J at 16-17 [Jul. 30, 2018 call transcript].

- Singer also offered to facilitate the admission of McGlashan's older son to the University of Southern California ("USC") through what he termed the "side door," noting that, in exchange for $250,000, he could arrange for McGlashan's son to be admitted to USC "through athletics." Singer explained: "You'd pay 250. You'd get accepted. . . . It may be before he even applies." *Id*. at 10.

- Singer added that, after McGlashan received an unofficial acceptance letter in the fall, "as soon as you get that letter, then they expect just a $50,000 check, and it goes to Women's Athletics." He said that "the other 200 comes in March, after you get your official, official letter." McGlashan responded: "I love it." *Id.*

- Singer made clear that the scheme would require falsely presenting McGlashan's son as an elite athlete. He told McGlashan: "I have to create a profile for him in a sport, which is fine, I'll create it. You know, I just need him-- I'll pick a sport and we'll do a picture of him, or he can, we'll put his face on the picture whatever. Just so that he plays whatever. I've already done that a million times." *Id*. at 11. This prompted McGlashan to note, "just as this plays out, my worry on this is, [my son] starts getting letters from the athletics program." *Id*. at 13.

- In a voicemail three weeks later, Singer told McGlashan that, because his son's school did not have a football team, "I'm gonna make him a kicker/punter and *they're gonna walk him through with football*, and I'll get a picture and figure out how to Photoshop and stuff . . . so we'll put a bunch of stuff about that on his profile." *See* Ex. K [Aug. 22, 2018 voicemail transcript]. Returning the call minutes later, McGlashan said: "That's just totally hilarious." *See* Ex. L at 1 [Aug. 22, 2018 call transcript].

- McGlashan then asked to confirm the financial details: "Just remind me again, we get all these done and the, the obvious deal you and I talked about, the 50K and the 200K. And – and then, do we know he's in?  You and I at least know he's in?" *Id.*

- Singer went on in the call to note that he would "Photoshop [McGlashan's son] onto a kicker," and send the profile to his contact at USC. McGlashan responded: "[I]t's too bad that she doesn't have a lacrosse program with scholarship positions.  That'd be easy." Singer replied:  "I know.  It'd be much easier. But she said, 'That's cool, let's do it that way.' So, that's the path we're gonna go." McGlashan responded:  "Okay perfect." *Id.* at 4.

### 2.   Defendants Mossimo Giannulli and Lori Loughlin

- Giannulli and Loughlin began working with Singer in the summer of 2015.  In an April 2016 email, Singer – responding to Giannulli's inquiry about his older daughter's college prospects – offered, "If you want [U]SC I have the game plan ready to go into motion.  Call me to discuss." *See* Ex. M [Apr. 22, 2016 email chain].

- In August 2016, Singer told the Giannullis that he would "create a coxswain profile" for their daughter, and noted that "[i]t would probably help to get a picture with her on an ERG in workout clothes *like a real athlete* too." *See* Ex. N [Aug. 19, 2016 email chain]. (emphasis added).  Giannulli – whose daughter was not a coxswain and did not row crew – copied Loughlin and replied, "Fantastic. Will get all." *Id.*  Giannulli later emailed Singer a picture of his daughter posing on an ergometer. *See* Ex. O [Sept. 7, 2017 email chain].

- On October 29, 2016 – after the USC Subcommittee on Athletic Admissions approved the admission of Giannulli's daughter as a purported crew recruit – Singer emailed Giannulli: "Please send 50K payment to the person below . . . Donna Heinel[,] Senior Womens Associate Athletic Director[,] c/o of USC Athletics[,] . . . Check should be made out to USC Athletics[.]" *See* Ex. P [Nov. 1, 2016 email chain].  Giannulli asked: "For accounting purposes would I categorize this as *a donation*?" *Id.* (emphasis added).  Singer replied: "Yes."[3] *Id.*

- Just days later, Giannulli caused his accountant to send the check, made payable to USC Athletics, and bearing a note:  "Donna Heinel, Senior Womens Associate Athletic Director." *See* Ex. Q [Nov. 2, 2016 payment].

- On November 28, 2016, Singer emailed Giannulli and Loughlin a letter from USC indicating that Giannulli's daughter had been provisionally admitted based upon "records [that] indicate that [she has] the potential to make a significant contribution to the intercollegiate athletic program." *See* Ex. R [Nov. 28, 2016 letter].

---

[3] During the same period, Giannulli rebuffed a USC development official's offer to "flag" his daughter's application, writing, "I think we are squared away." *See* Ex. P-1 [Sept. 27, 2016 email chain].  Giannulli forwarded the email to Loughlin, adding, "The nicest I've been at blowing off somebody." *Id.*

- In March 2017, after Giannulli's daughter was formally admitted, Singer's bookkeeper emailed Giannulli and Loughlin an invoice for a purported $200,000 contribution to KWF. Giannulli forwarded the invoice to his financial advisor, writing, "Good news my [older] daughter [ ] is in [U]SC . . . bad [news] is I had to work the system." *See* Ex. S [Apr. 10, 2017 email chain and invoice].

- Four months later, Singer requested that Giannulli and Loughlin send an "Action Picture" of their younger daughter for use in an athletic profile that he noted would falsely present her as a coxswain for the L.A. Marina Club crew team. *See* Ex. T [Jul. 16, 2017 email].

- Giannulli, copying Loughlin, emailed Singer a photograph of their younger daughter on an ergometer. *See* Ex. U [Aug. 6, 2017 email chain and photograph].

- The following month, after co-conspirator Laura Janke, who prepared the falsified profile, told Singer she needed additional information to "finish her resume and add a rowing club to her profile based off where she lives," Singer forwarded Janke's request to Giannulli, who forwarded it to Loughlin. *See* Ex. V [Aug. 7, 2017 email chain].

- In November, after Giannulli and Loughlin's younger daughter was fraudulently admitted to USC as a purported crew recruit, Singer instructed Giannulli and Loughlin to send a $50,000 check, payable to "USC Womens Athletics," to Heinel's attention at USC, noting that "the rest of the 200k will be paid to our foundation a 501 3C after [your younger daughter] receives h[er] final letter in March." *See* Ex. W [Nov. 29, 2017 email chain].

- In a subsequent text message, Singer, acting at Heinel's direction, sent Giannulli revised instructions to "[p]lease send your USC check to Donna Heinel at the same address but instead of Women's Athletic Board please make out to the Galen Center Gift Account." *See* Ex. X [Dec. 4, 2017 voicemail transcript and Dec. 5, 2017 text message].

- In February 2018, after their younger daughter received her formal acceptance letter, Loughlin forwarded Giannulli a $200,000 invoice from KWF. *See* Ex. Y [Jan. 30, 2018 email chain]. Giannulli forwarded the invoice to his financial advisor, noting that it was "*the last college 'donation'* for" his daughter, and asking, "Can't I write this off?" *See* Ex. Z [Feb. 6, 2018 email chain] (emphasis added).

- In April 2018, Giannulli reprimanded a high school counselor for suggesting to USC that his daughter was not, in fact, a coxswain. Giannulli assured the counselor, falsely, that she was. *See* Ex. AA [Apr. 12, 2018 counselor notes]. In an email to Giannulli, the counselor wrote that he had informed USC "that you had visited this morning and affirmed for me that [your younger daughter] is truly a coxswain." *See* Ex. BB [Apr. 12, 2018 email chain].

   3.   <u>Defendant John Wilson</u>

- Wilson and his wife began working with Singer to gain entrance to USC through the "side door" in the spring of 2013. In an email exchange in February 2013, Singer told Wilson that the deadline for pursuing USC through the side door was "mid-July," adding, "Jovan

is giving me 1 boys slot and as of yet no one has stepped up to commit that is why it is later."[4]  *See* Ex. CC [Feb. 12, 2013 email chain].

- Wilson acknowledged to Singer that his son was not qualified to be recruited by USC for water polo.  Wilson asked, "Would the other kids know [my son] was a bench warmer side door person?"  Wilson also inquired about how often his son would be required to participate in team practices.  Singer assured Wilson that the extent of his son's "commitment" was simply "to be on the roster not attend all practices but he will have to attend drug tests and other mandatory functions for 1 year then walk away/frankly after the 1st semester he can move on."  *See* Ex. DD [Mar. 27, 2013 email chain].

- In August, Wilson queried Singer about the timing of his side door payments, asking, "What does Jovan need by [S]ept 20?  Do u have what we need?  Do I make the first payment to u then?"  *See* Ex. EE [Aug. 24, 2013 email chain].  Singer responded that he had everything he needed to send to Vavic "so he can add [your son] to his recruit list and present him to admissions in October."  *Id.*  Wilson replied:  "Great - let me know when u have verified u have it all completed and into Jovan. Also when and where to wire money."  *Id.*

- In October, Singer advised Wilson, "Jovan has [your son]'s stuff and asked me *to embellish his profile more*, which I am doing."   *See* Ex. FF [Oct. 13, 2013 email chain] (emphasis added).  Wilson responded, "When is Jovan going to be able to give us decision on USC?  And when do I pay u?  Was it 50% in nov?  50% in feb when we get final official notice?"  *Id.*  Singer replied, "*No payment of money till* he gets a verbal and written from admissions and then 50 percent to a savings account I set up.  Then the remainder upon an acceptance letter in March with everyone else."  *Id*. (emphasis added).[5]

- Six days later, Singer sent Wilson an athletic profile that included numerous fabrications, including the false claim that Wilson's son was co-captain of his high school team.  *See* Ex. GG [Oct. 19, 2013 email and profile].  Singer once again confirmed to Wilson that this "approach" would not require his son to actually "get in the pool."  *See* Ex. HH [Oct. 23, 2013 email chain].

- Shortly after the admissions decision, Wilson emailed Singer under the subject line "USC fees."  Ex. II [Mar. 1, 2014 email chain].  He asked:  "What are the options for the payment?  Can we make it for consulting or whatever from the [K]ey so that I can pay it from the

---

[4] At the time, Jovan Vavic was the USC men's water polo coach.

[5] In a sworn affidavit attached to the defendants' motion, Wilson contends that Singer described the "side door" to him as a "legitimate and common practice," and "never said that any part of my donation would be a bribe or illegal payment to any individual or school."  *See* Def. Br., Ex. QQ, ¶¶ 3-4.  Wilson thus contends that when Singer told him that the USC water polo coach "asked me to embellish [Wilson's son's] profile more," and instructed him that there would be "[n]o payment of money till [the coach] gets a verbal and written from admissions and . . . the remainder upon an acceptance letter in March," Wilson understood that to be "proper (and common)."  *Id*. ¶ 5.

corporate account?"  *Id.*  Singer responded that he could make the invoice for business consulting fees, so that Wilson could "write [it] off as an expense."  *Id.*  Wilson replied, "Awesome!"  *Id.*

- In April, Wilson's company, Hyannis Port Capital, wired $100,000 to KWF, $100,000 to Singer's for-profit entity, The Key, and $20,000 to Singer directly, and The Key issued an anonymous $100,000 cashier's check to USC Men's Water Polo, listing the "purpose/remitter" as "Wilson Family."  *See* Ex. JJ [Apr. 1, 2014 email chain and attachments]; Ex. KK [payments]; Ex. LL [water polo check].  USC sent Wilson a gift receipt for the donation.  *See* Ex. MM [gift receipt].  Wilson deducted a portion of the payments from his taxes as a purported business expense, and the rest as a charitable donation.

    4.  Defendant Robert Zangrillo

- In a telephone call on June 11, 2018 , Singer told Zangrillo that he had asked members of the USC athletics department to facilitate Zangrillo's daughter's admission as a fake crew recruit, and that they agreed to do so.  Singer said:  "So I convinced them that she's at [a local community college offering online courses], she's gonna do well, 'Would you guys help her get in? We'll put her as though she's been sculling and rowing, and then will you get – will you put me on the phone with the crew coach?'  *Crew coach got on the phone with me, said, 'Okay, I will take her. You guys help us, we'll help you.*  I'll take her, I just need her to finish all these credits and all the – all of her classes.'"  *See* Ex. NN at 2 [June 11, 2018 call transcript].  In fact, Zangrillo's daughter neither sculled nor rowed.

- Singer and Zangrillo went on to discuss that a Singer employee would complete two online courses for Zangrillo's daughter – one in biology, one in art history – to use in support of her application.  *Id.* at 5.

- Zangrillo's daughter was notified of her conditional acceptance as a transfer student to USC just six days later, prompting Zangrillo to ask Singer to confirm whether she was "accepted through athletics."  *See* Ex. OO [Jun. 26, 2018 email chain].  Singer forwarded the email to Heinel at USC, and then forwarded Heinel's affirmative response, sent from her USC email account, back to Zangrillo.  *Id.*

- In September, Singer confirmed that Zangrillo should have received *"an invoice for 200K donation"* from KWF, and instructed Zangrillo's assistant that "a check for 50K goes to USC Women's Athletics c/o Sr Women's Administrator Donna Heinel" – prompting her to inquire if she needed "to reference anything for the check to USC or just write donation on it?"  *See* Ex. PP [Sept. 20, 2018 email chain] (emphasis added).  Singer replied: *"Reference Women's Athletics Donation."*[6]  *Id.* (emphasis added).

---

[6] In an email to Zangrillo on September 5, 2018, Zangrillo's assistant asked, of the KWF invoice:  "If it is donation, can it be deductible and go directly to USC?"  *See* Ex. PP-1 [Sept. 5, 2018 email chain].

- That same day, Zangrillo wired $200,000 to KWF as a purported charitable donation, and mailed a check to Heinel's attention, in the amount of $50,000, payable to "USC Women's Athletics." *See* Ex. QQ [Zangrillo check]; *See* Ex. RR [Zangrillo payment].

    5.  Other Defendants

- When defendant Marci Palatella asked, in March 2016, for advice on how to "position" her son for his college applications, Singer responded: "Are you willing to make a contribution of several hundred thousand *as a donation* to get him in as a participant in someone's program?" *See* Ex. SS [Mar. 14, 2016 email chain] (emphasis added); *see also* Ex. TT [Oct. 3, 2016 email chain]. Palatella replied: "Money, for the right environment, Yes. But he can never know." *See* Ex. SS. Later, after Palatella's son was admitted to USC as a purported football recruit – notwithstanding Palatella's acknowledgment that he had dropped off of his high school football team – Palatella mailed Heinel a $100,000 check, payable to the USC Women's Athletic Board. *See* Ex. UU [Jan. 2, 2018 email chain]. Palatella later paid an additional $400,000 as a purported contribution to KWF, the same "charity" to which she had previously made a $75,000 "donation" to have Riddell correct her son's SAT exam.[7] *See* Ex. VV [Mar. 7, 2017 email and invoice]; *see also* Ex. WW [Mar. 14, 2016 email (referring to "the fudging of the scores")].

- In a text message to defendant Homayoun Zadeh – whose daughter was accepted as a fake lacrosse recruit – Singer wrote: "My foundation sent the money as requested. Normally the first 50k is sent immediately after acceptance and before the final letter is received. Then the next portion is sent soon after the final letter is provided. Since both are happening on top of each other *I sent the monies to my contact as a donation . . . . The group helping wants the credit and funds* so it is cleaner through me." *See* Ex. XX [Mar. 20, 2017 text message chain] (emphasis added).

    C.  The Approach of Rick Singer

Government agents approached Singer on September 21, 2018, during a meeting in a Boston hotel room between Singer and the women's soccer coach at Yale University, who was cooperating with the government's investigation. Agents interrupted the meeting, disclosed the existence of the investigation to Singer, and offered him the opportunity to cooperate against his co-conspirators. Agents began interviewing Singer that day, and met with him again the next day. Four days later, Singer, accompanied by his attorney, met with the government pursuant to the

---

[7] While most of the defendants understood their money to be going to designated programs, Palatella assumed that it was benefiting the recipients personally. In a January 9, 2019 text message to a friend, she confided, "I don't think most of it went to the school between us only. Please never ever repeat anything." *See* Ex. WW-1 [Jan. 9-12, 2019 text message chain].

terms of a standard proffer agreement.  The proffer occurred over the course of three days, between September 26 and September 28, 2018, in California.  On September 27, 2018, Singer authorized a consensual wiretap of his cellular phone (the "8802 phone").

D.  The Consensual Wiretap

In ensuing calls with the defendants who were ultimately charged in this case, Singer advised them – at the government's instruction and, on occasion, using a script the government drafted with his assistance – that KWF was being audited by the Internal Revenue Service ("IRS"), and that questions might arise about their purported donations.   Singer reiterated his earlier characterizations of how the defendants' money had been distributed, while assuring them that he would *not* share the truth with the IRS.  The ruse was designed to elicit additional evidence of the defendants' understanding of the scheme, and their consciousness of guilt.  During the calls, the defendants did not contradict Singer's description of the scheme.  Rather, they agreed to falsely advise the IRS, if asked, that their payments were charitable contributions intended to help "underserved kids."  For example:

1.  Zangrillo

- On October 25, 2018, Singer called Zangrillo and said:  "I won't say that the, uh, the moneys [paid to KWF] went to go pay Donna Heinel for USC to get [your daughter] in."  *See* Ex. YY at 3-4 [Oct. 25, 2018 call transcript].  Zangrillo responded:  "What will be the thing – what was the [daughter's] payment for?  Just so I know so we have the story straight."  *Id.*

- Singer advised Zangrillo that he would tell the IRS that Zangrillo's payment was for "our programs that handle underserved kids."  *Id.*  Zangrillo replied:  "OK, great, perfect."  *Id.*

The call thus confirmed Zangrillo's understanding of the arrangement he had discussed with Singer *months earlier*:  that his daughter had been admitted to USC "through athletics," and that Zangrillo's purported donations to KWF and to "USC Women's Athletics c/o Sr Women's

Administrator Donna Heinel" were, in fact, a *quid pro quo* to "help [his daughter] get in . . . as though she's been sculling and rowing."  (*See* pages 8-9, *supra*).

### 2.  Giannulli and Loughlin

- On October 25, 2018, Singer called Giannulli and said that IRS agents had asked him "about your two payments of 200,000," adding:  "And, of course, I'm not gonna say anything about your payments going to Donna Heinel at USC to get the girls into USC, through crew." *See* Ex. ZZ at 2 [Oct. 25, 2018 call transcript]. Giannulli responded: "Sure." *Id.*

- Singer said:  "Donna called me couple weeks ago and says, 'Hey, uh,' you know, 'going forward, can you use the same format you used for [Giannulli's older daughter] and [his younger daughter], and the regattas that you put in there, for any girls, going forward, that don't row crew?' So it's funny how – I thought I was just makin' stuff up." *Id.*  Giannulli responded:  "Uh, right.  Perfect." *Id.* at 3.

- Singer then said, "I just want to make sure our stories are the same . . . and that your $400K was paid to our foundation to help underserved kids." *Id.*  Giannulli responded:  "Uh, perfect." *Id.*

- Singer later called Loughlin, telling her that if the IRS called her, "nothing has been said about the girls, *your donations* helping the girls get into USC to do crew even though they didn't do crew.  So nothing like that has been ever mentioned."  Loughlin asked:  "So we just – so we just have to say *we made a donation* to your foundation and that's it, end of story?" *See*  Ex. AAA at 4 [Nov. 29, 2018 call transcript].  Singer responded:  "That is correct." *Id.* at 5.

These calls were consistent with Singer's previous communications with Giannulli and Loughlin.  (*See* pages 5-7, *supra*).

### 3.  McGlashan

- On October 24, 2019, Singer called McGlashan and said: "Mark [Riddell] starts talking to me and tells me a story that he, he got interviewed by the – an IRS agent . . . about the payments that he received from my foundation.  And, as you know, when families pay for either, either taking the test or going through the side door, all the money goes through my foundation, and then I pay it out to whoever needs to get paid – like I did for, you know, [your son] – [your son's] test when he took the test at West Hollywood Prep.  So I paid half of it to Mark [Riddell, the corrupt proctor] and half of it to West Hollywood Prep [corrupt test administrator] through my foundation, so that the family essentially has no connection back to what has happened." *See* Ex. BBB a 3-4 [Oct. 24, 2018 call transcript].

- Singer went on to say that "since Mark does tutoring for us he told the agent that, you know, he works with kids for us – underserved kids in the . . . [Florida] area." *Id.* at 4.

McGlashan did not dispute any of what Singer said, before adding that "the good news is, I mean, from, from my personal perspective . . . we sorta haven't done anything yet, which I'd prefer not to do in the context – just 'til it's all cleared up exactly, you know . . . .  I'd rather just sorta lay low."  *Id.* at 5-6.

This call corroborates McGlashan's understanding that his purported donation to KWF – in payment of an invoice "Regarding West Hollywood College Prep" – was for cheating on his son's ACT exam, and that KWF, in turn, made payments to co-conspirators who facilitated that fraud.  Singer's statements and McGlashan's response – that he would "rather just sorta lay low" during the IRS investigation – also corroborate McGlashan's consciousness of guilt concerning the "side door." (*See* pages 4-5, *supra*).

4.  Wilson

In or about September 2018, Wilson contacted Singer to inquire about potential "side door" opportunities for his twin daughters.  Thus, in contrast to Singer's consensual calls with the other defendants, his calls with Wilson were almost entirely prospective, focusing not on Wilson's son – who had been admitted to USC nearly five years earlier – but on his daughters.  In those calls, Singer offered Wilson an explicit *quid pro quo*:  send money, through Singer's foundation, to the coaches for their designated programs, in exchange for their agreement to recruit Wilson's daughters as purported athletes without regard for their athletic abilities.

- In a call on September 29, 2018, Singer explained that "all of the coaches have, you know, they have guaranteed spots."  *See* Ex. CCC at 5 [Sept. 29, 2018 call transcript].  Wilson, referring to his daughters, asked, "What if they're not really that good?"  *Id.*

- Singer replied:  "[A]t the end of the day, by the side door, I may be able to go to the sailing coach and say, "Hey, this family's willing to make the contributions.  She could be on your team.  She is a sailor.  She may not be up to the level you are, but she can con – you know, you're gonna get a benefit, and the family's gonna get benefit.  So are you will – are you interested in doing that?"  *Id.* at 5-6.

- During the call, Wilson inquired about the financial component of the scheme, noting that "last time I did this [for my son], you didn't really make any money on this, on the side,

this stuff.  You just charge, and *then you make a donation to the school, and that's it*?"  *Id.* at 6.

- Singer responded:  "[I]t depends," adding that "compared to when, you know, we did [your son], was that essentially *now the money goes into my foundation, as a donation.*"  *Id.* Wilson asked, "Oh, to your foundation, not to the schools?"  *Id.* at 7.

- Singer replied:  "Yeah, then that way the kids don't know it happens, right? . . . [A]nd then the other part of that is they don't chase you all the time for money. 'Cause once you – you know, once you're – they know you gave money, that's a different story. And then what I can – what I'll do is I'll split the money potentially to the coach or other parties that are at that school that need the money, right? . . . Or it may go right to the coach that's helping us.  It just depends on the school. . . . And then the kids get in the school."  *Id.* at 7-8.

While Singer sometimes referred to the money going "to the coach" and sometimes "to the schools," he consistently made clear in his calls with Wilson that the money was a *quid pro quo* for recruiting Wilson's daughters as purported athletes, without regard for their abilities.  In October 2018, for example, Singer – acting at the direction of law enforcement – told Wilson that his daughters "don't have to play.  They just – that's the path I'm gonna get 'em in on."  *See* Ex. DDD at 4 [Oct. 15, 2018 call transcript].  Wilson replied, "Gotcha."  *Id.*  Two days later, Wilson's company wired $500,000 to KWF.  *See* Ex. EEE [2018 payments].  Wilson emailed his bookkeeper that the payment was a *"$500k donation I am going to make this year.*  Tax write off and help getting into colleges."  *See* Ex. FFF [Oct. 17, 2018 email chain] (emphasis added).

That same month, Singer advised Wilson that he had secured a "side door" for one of Wilson's daughters at Stanford, and that the Stanford sailing coach, John Vandemoer, had hidden the deal from the university.

- On October 27, 2018, Singer told Wilson, "I just gave the Stanford sailing coach [$]160,000 for his program and while we were having that conversation I said, 'Hey, I'm hoping that this 160 that I'm helping you with helps secure a spot for next year.  Can I be guaranteed a spot for next year?'  And he said, 'Yes.' . . .  So essentially if you're – I want you to have first dibs, like I told you.  So if you want I can provide John Vandemoer – which I'm going to essentially send John directly the check, to the coach.  I can send him your [$]500,000 that you wired into my account to secure the spot for one of your girls.  I asked him for a second spot in sailing and he said he can't do that because *he has to actually*

13

*recruit some real sailors so that Stanford doesn't catch on.*"  *See* Ex. GGG at 1-2 [Oct. 27, 2018 call transcript].

- In November 2018, Singer – using a ruse – told Wilson, "So I got the senior women's administrator at Harvard is going to give us a spot.  What we have to do is we'll have to give her $500,000.  That money, obviously, like the others, will go through my foundation and then I will fund the senior women's administrator at Harvard."  *See* Ex. HHH at 2 [Nov. 29, 2019 call transcript].  Wilson asked whether this would involve a "team or anything like that," and Singer replied, "She'll figure it out. . . .  It doesn't matter the sport at this time. . . .  [S]he will just get her in through athletics in one of the sports but it won't matter."  *Id.* at 3.  Wilson responded:  "[S]ailing's actually a logical thing.  She could be even the mascot, whatever, but she knows sailing."  *Id.*  In December 2018, Wilson's company wired another $500,000 to KWF.  *See* Ex. EEE.

E.   The Consensual Search of Singer's Phone

On October 5, 2018, about a week after the California proffer sessions, Singer traveled to Boston at the government's instruction and executed a consent to search form for the 8802 phone. Agents extracted the phone and returned it to Singer, who continued to use it, subject to consensual monitoring.  Thereafter, over the course of Singer's proactive cooperation, agents seized the phone for extraction on seven more occasions.  Singer consented to each of the searches.[8]

The government also requested permission from Singer's attorney to review the phone extraction without a taint protocol.  On October 11, 2018, Singer's attorney noted that, after reviewing his text messages with Singer, he consented to a review of the phone without a taint protocol.

On October 23, 2018, before reviewing the cell phone extraction, the government interviewed Singer again in the presence of his attorney.  Singer acknowledged that he had repeatedly tried to obstruct the government's investigation in the days after agents first approached

---

[8] Singer signed a standard consent to search form each time.  He did not specify, one way or the other, on the forms, whether he was waiving attorney client privilege over potentially privileged materials on the phone.

him, by secretly telling several targets that he was under criminal investigation and that his phone was being monitored.[9]

The initial extraction of Singer's phone was provided to the Assistant United States Attorneys ("AUSAs") assigned to the investigation on or about October 28, 2018.  That same day, an AUSA reviewing the extraction saw part of an entry Singer had written in the phone's "Notes" application.  Singer's note included the following:

> Oct 2
> Loud and abrasive call with agents. They continue to ask me to tell a fib and not restate what I told my clients as to where there money was going – to the program not the coach and that it was a donation and they want it to be a payment.
>
> I asked for a script if they want me to ask questions and retrieve responses that are not accurate to the way I should be asking the questions. Essentially they are asking me to bend the truth which is what they asked me not to do when working with the agents and Eric Rosen.
>
> Liz raised her voice to me like she did in the hotel room about agreeing with her that everyone Bribed the schools. This time about asking each person to agree to a lie I was telling them.

See Ex. III at 9 [Singer iPhone Notes].  Singer also referred in the October 2 note to the government's purported desire to "nail" one target of the investigation, Gordon Caplan, "at all costs."[10]  Id.  At or about the same time, a contract attorney assigned to the investigation reviewed a different portion of Singer's notes, and reported that finding to the assigned AUSAs.

---

[9] Singer later pled guilty to a single count of obstruction of justice in connection with this conduct.  See United States v. Singer, 19-cr-10078-RWZ, Dkts. 1, 19.  Of the seven individuals to whom Singer disclosed the existence of the investigation, the government ultimately charged only one:  McGlashan.

[10] Caplan, who is not a defendant in this case, was charged by complaint and subsequently agreed to plead guilty to an information charging him with a single count of mail fraud and honest services mail fraud in connection with participating in Singer's scheme by cheating on his daughter's ACT exam.  See United States v. Caplan, 19-cr-10117-IT-4, Dkts. 3, 312, 380.  He was sentenced to one month in prison and is currently on supervised release.  Id., Dkt. 510.

Based on the content the attorneys reviewed, the AUSAs believed that Singer had prepared the notes for his attorney, and that they might be protected by the attorney-client privilege - notwithstanding Singer's consent to search his phone and his attorney's agreement to proceed without a taint protocol.  (As noted above, Singer's attorney had reviewed his text messages with Singer, but not the notes, before agreeing to allow the search to proceed without a taint protocol.)  Accordingly, the AUSAs did not review the notes further.  Notably, at that time, neither Singer nor anyone else in the case had been charged with a crime, and the government had made no charging decisions and was under no discovery obligations – no charges would be brought for nearly five months.

The government did not initiate an investigation of the contentions in Singer's notes because there was nothing to investigate.  Agents were aware that those contentions were untrue and had been drafted during a period when Singer had not fully accepted responsibility for his conduct and was, in fact, actively attempting to obstruct the investigation.  As illustrated above, in his consensual calls with the defendants, Singer did *not* make statements inconsistent with their prior arrangements, and agents never instructed him to do so.[11]  Indeed, with the exception of a single call with defendant Wilson on September 29, 2018 – referenced above – Singer did not even have a substantive call at the direction of federal agents with *any* of the moving defendants before writing his October 2 note.[12]

---

[11] Government investigators did instruct Singer to be even more explicit about the details of the scheme with targets who had not *yet* committed to the side door – among other things, to avoid any later claims of entrapment.  None of those individuals is a defendant in this case.  Likewise, agents did instruct Singer to use a ruse concerning an IRS audit to elicit admissions from his co-conspirators, but such tactics are both lawful and unexceptional, as the defendants concede.

[12] Singer did call Wilson on September 23, 2018 to cancel a scheduled meeting, but did not speak to him substantively about the scheme.

F.   Deleted Text Messages

As indicated above, the government extracted Singer's 8802 phone eight times between October 5, 2018 and March 11, 2019.  The government did this to ensure that it captured all activity on the phone during Singer's proactive cooperation.  The extractions, taken together, appear to indicate that Singer deleted some iMessages.  Of those, most were sent between October 2016 and September 26, 2018, before Singer consented to the wiretap.  The remaining iMessages were sent after Singer consented to the wiretap – most of those between October 5, when the government first took and extracted the phone, and March 10, 2019, just before the last extraction.

The extractions of Singer's 8802 phone do not reflect the substance of deleted iMessages or the date(s) of deletion.  Some of the deleted messages sent before Singer's cooperation involved the defendants in this case.  Presumably, since the defendants sent or received those messages, they are aware of their contents.  None of the iMessages deleted after Singer began cooperating involved defendants charged in the instant indictment.  In this regard, the defendants' reliance on Exhibit H, a February 19, 2020 letter from defendant Abdelaziz to the government, is misleading.  The letter asserts that "a substantial number . . . of Mr. Singer's iMessages after late September 2018 . . . have been deleted, including messages with the defendants in this case," and then cites five deleted text messages, making it appear that all five involve defendants before this Court.  In fact, none of them does, and only one even involves anyone who has been charged in any of the college admissions cases:  a parent who pled guilty to an information before a different Session of this Court.

From late September 2018 through late October 2018, the government instructed Singer, at least twice, not to delete anything from his phone, including text messages.  *See, e.g.*, Ex. JJJ [agent notes].  The government assumes that Singer's apparent failure to comply with those

instructions – although not with respect to any message involving any defendant in this case – will be the subject of cross examination at trial and/or a factor considered by the Court at his sentencing.

While the government is still investigating how many iMessages were deleted from the 8802 phone, and whether any of those messages are even relevant to this case, the number of deleted iMessages may be smaller than it appears. That is because of the way the iPhone reflects the deletion of "group" messages, which involve more than two participants. Thus, although Singer appears to have deleted messages, he likely deleted far fewer than those reflected on the phone extractions or suggested by the defendants' brief. For the reasons set forth below, the precise number of deleted texts is not relevant to any issue before this Court; nonetheless, the government intends to provide additional information to the defendants as necessary once it completes its review.[13]

G.  Discovery Disputes

The government indicted the defendants between March 5 and April 9, 2019, and began producing automatic discovery shortly thereafter. The government's initial productions were voluminous and included, among other things, calls, emails and texts obtained via Title III wiretaps; emails and other documents obtained via search warrants; voicemails and text messages obtained via the consensual searches of Singer's phone; financial records; surveillance photographs; and pen register and historical cell site data. The government advised the defendants that discovery would be provided on a rolling basis, and multiple additional productions have followed the initial productions, as is standard in complex cases.

---

[13] The government is still trying to obtain the substance of deleted iMessages and will produce copies to the defendants if those efforts are successful.

H.  Status Reports and Status Conferences

In a joint initial status report filed with the Court in May 2019, the parties agreed to seek additional time before proposing deadlines for discovery motions, in light of the large volume of discovery.  *See* Dkt. 388.  At the initial status conference in June, counsel for then-defendant Elizabeth Henriquez requested, on behalf of all the defendants, that the government produce FBI-302 reports of witness interviews, noting that "[i]f Rick Singer was telling other parents that the money that they were giving to Key Worldwide was going to go to the athletic programs, we think that's exculpatory."  *See* Ex. KKK at 10 [Jun. 3, 2019 transcript].  The government responded that, "it simply doesn't matter whether the money went to a coach's program or whether it went to a – the coach's pocket directly.  A bribe is simply a *quid pro quo* with the intent to defraud, and all the Defendants have been charged with that."  *Id*. at 13.  The government went on to suggest that the defendants "review the discovery and then we can meet, confer."  *Id.*  At that point, counsel for defendants Sidoo and Zangrillo suggested that the parties "reserve for a time that Your Honor felt it was appropriate to tee up and crystallize this issue where we claim that is exculpatory evidence and the Government has just said it's not."  *Id*. at 14.  The Court agreed, noting, "[I]t's a good idea what everyone is saying, that we wait and let this issue kind of develop, and then I'm happy to take it up."  *Id.*  To sum up:  both the government and the defendants were transparent with the Court regarding their views on the nature of the requested evidence.

In a joint status report filed in September, the parties again agreed to put off the filing of discovery motions and continue to meet and confer, with a particular focus on the defendants' *Brady* requests.  *See* Dkt. 574.  At an October 2019 status conference – *just five months before the defendant's pending motion alleging misconduct* – counsel for defendants Sidoo and Zangrillo began the proceedings by noting, "No criticisms of discovery," but requested, on behalf of all

defendants, that "all of the deadlines that the Government has proposed be deferred for discussion on January 17," noting that "we've only had literally four and a half months to go through three million pages of materials and thousands of audios." *See* Ex. LLL at 9-11 [Oct. 2, 2019 transcript]. Counsel for defendant McGlashan added: "I think the Government has been working, from my perspective, in good faith to try to resolve issues, but as of today, a *Brady* review is not complete, they've acknowledged." *Id.* at 15.

Beginning in September 2019, counsel for the defendants began sending hundreds of discovery requests to the government, contending that all of the material they sought was either material to the defense or exculpatory.[14]  The government, while disputing that the requested material was, in fact, exculpatory, reviewed dozens of FBI-302 interview reports in light of the requests and summarized responsive information in a series of letters to defense counsel in November 2019 and January 2020, in many instances quoting directly from the FBI reports.

Notwithstanding those disclosures, various defendants in December filed motions to compel the production, among other things, of the full 302 reports of the government's interviews with Singer and employees of USC.  In response to those motions, the government voluntarily provided its disclosure letters and the 302 reports to Magistrate Judge Kelley for *in camera* review. Thereafter, at a January status conference, counsel for defendant Zangrillo again advised the Court that the defendants had "received an enormous amount of discovery.  It's almost unquantifiable

---

[14] Counsel for defendant McGlashan alone sent the government 130 separate discovery requests.  Many of the defendants' requests focused on evidence that Singer told his clients their payments were donations and did not tell them they were "bribes."  Presumably, the defendants view this information as exculpatory because – sanitized of the associated effort to secure their children's admission to college as fake athletic recruits based on bogus credentials, or the guarantee that coaches/administrators would facilitate that fraud in exchange for the money – a donation to a university fund might appear to be legitimate.

between the audio tapes, the document discovery, the email discovery, the discovery that comes in from third parties." *See* Ex. MMM at 16-17 [Jan. 17, 2020 transcript].

I.   The February 26 Disclosure

A "taint" AUSA was assigned to the case in October 2018, but was not provided access to Singer's 8802 phone until August 2019, in part because there was no criminal case – and thus no disclosure obligation – until the spring of 2019.  By that date, non-privileged text messages and emails recovered from the phone had been produced.  In October, the government provided a copy of Singer's iPhone notes to Singer's attorney to review for privilege, something the government concedes should have been done earlier.  Singer's attorney did not immediately respond; from at least November 2019 through February 2020, he was undergoing radiation therapy and chemotherapy and did not review the notes.

On February 19, 2020, a member of the prosecution team asked the taint AUSA to provide additional information from the phone in response to a defense request.  That same day, the taint AUSA reviewed the notes for the first time.  Over the next four days, the taint AUSA and his supervisor discussed with Singer's attorney his claim that the notes were privileged, resulting in Singer's agreement to disclose the notes to the prosecution team on February 24, 2020.  The notes were produced to the defendants two days later.

Through the above sequence of events, the notes were produced later than they should have been, but the defense has suffered no prejudice.  At the time the notes were produced, no trial date had been set in this case, none of the defendants' discovery motions had been decided, and none of their dispositive motions had yet been filed.  Moreover, the notes are just 47 pages long and, of those, the defendants contend that only a few lines are exculpatory.

Since February 26, the government has produced significant additional materials to the defendants, including virtually all 302s of witness interviews, and the agent notes underlying them, and all extractions in its possession of any phone Singer used during the pendency of his proactive cooperation.  These materials include a significant amount of information that, under the Jencks Act and Local Rules, is not discoverable for many months, if at all.  The defendants do not dispute that, with nearly six months still remaining until the first trial in this matter, they have sufficient time to incorporate Singer's notes into their trial strategies.

## II.   **ARGUMENT**

The defendants contend that the government's conduct was so "outrageous" as to warrant dismissal of the indictment or, in the alternative, suppression of the consensual recordings.  They also seek an evidentiary hearing to ferret out the "scope and extent" of the purported misconduct. The defendants' requests should be denied.

The gravamen of the defendants' motion is their contention that the government fabricated evidence that they understood their payments to be illicit "bribes" going "to the coaches" rather than legitimate "donations" "to the university," and then sought to withhold evidence of that fact from them.  But that contention is flatly untrue – it is belied by the allegations in the indictment and the evidence in this case – and it doesn't even make logical sense.

First, the defendants' contention is untrue because, to the extent Singer said anything in the consensual calls about where the defendants' money went, it was consistent with what he and the defendants had discussed previously – as the evidence of their actions, and their interactions with Singer *before* the government approached him makes clear.  That, of course, is why none of the defendants contradicted Singer in any of the consensual calls.

Second, the defendants' contention makes no sense, because the indictment charges the defendants with making *purported donations to designated athletic programs* as a *quid pro quo* for having university insiders recruit their children as purported athletes based on fabricated credentials. Just because neither Singer nor the defendants actually used the word "bribe" to describe the purported donations doesn't mean that they were legitimate. They were bribes, regardless of what Singer and the defendants called them, because, as the defendants knew, the corrupt insiders were soliciting the money in exchange for recruiting unqualified students, in violation of their duty of honest services to their employer. As the government noted ten months ago, at the initial status conference in this case, "*it simply doesn't matter whether the money went to a coach's program or whether it went to a – the coach's pocket directly. A bribe is simply a quid pro quo with the intent to defraud, and all the defendants have been charged with that.*" Ex. KKK at 13. The defendants' argument is thus premised on a straw man: that the government fabricated evidence of a crime, even though the evidence doesn't make out that crime and the government has not alleged it.

Third, the defendants' contention that the government deliberately withheld exculpatory evidence and committed a *Brady* violation is meritless because, first, as discussed above, the late disclosure was simply an error, and, second, regardless of how one characterizes the evidence, the government has now – of its own accord – disclosed it months before trial, and the defendants have not been prejudiced.

At bottom, what the defendants are alleging is that they were entrapped by statements in the consensual recordings that they contend were untrue or misleading. (Def. Br. at 1). That is absurd but, in any event, it is an issue for trial. Even if, contrary to fact, the agents "browbeat Singer," as the defendants assert (*id.*), they do not, because they cannot, allege that anyone

browbeat *them*.  And even if the defendants could meet their threshold burden of proving *both* that the government wrongfully pressured them *and* that they were not predisposed to commit the charged crimes – which they cannot – they would at most be entitled to put that issue before the jury.  *See United States v. Diaz-Maldonado*, 727 F.3d 130, 136-37 (1st Cir. 2013).  The defendants cannot circumvent black-letter law simply by dressing up an entrapment motion as something else.

A.   There Is No Basis for the Drastic Sanction of Dismissing an Indictment

Former Chief Justice Rehnquist authored the doctrine now known as "outrageous government misconduct" when, in dicta, he noted that courts someday might be presented a situation in which "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from . . . obtain[ing] a conviction."  *See United States v. Russell*, 411 U.S. 423, 431-32 (1973); *United States v. Santana*, 6 F.3d 1, 3 (1st Cir. 1993).  Since that time, the "banner of outrageous misconduct [has] often [been] raised but seldom saluted."  *Santana*, 6 F.3d at 4 ("[T]he doctrine is moribund; in practice, courts have rejected its application with almost monotonous regularity.").  That is particularly true in this Circuit where such a claim has *never* been successful.  *See, e.g., United States v. Anzalon*e, 923 F.3d 1, 6 (1st Cir. 2019) ("This defense, however, has never succeeded in our Circuit . . . ."); *United States v. Luisi*, 482 F.3d 43, 59 (1st Cir. 2007) ("While the doctrine is often invoked by criminal defendants, it has never yet been successful in this [C]ircuit."); *United States v. Guzman*, 282 F.3d 56, 59 (1st Cir. 2002) ("[t]he law frowns on the exoneration of a defendant for reasons unrelated to his guilt or innocence," and thus "the power to dismiss charges based solely on government misconduct must be used sparingly").

It is no surprise that the doctrine is nearly always rejected.  Criminal charges should be dismissed "only in those very rare instances when the government's misconduct is so appalling

24

and egregious as to violate due process by shocking the universal sense of justice." *United States v. Therrien*, 847 F.3d 9, 14 (1st Cir. 2017) (internal quotations and citations omitted).  Put another way, outrageous misconduct is a defense "reserved for only the most egregious circumstances and should not be invoked each time the government acts deceptively or participates in a crime that it is investigating," *id.* (internal quotations and citations omitted) – acts falling far short of anything that happened here.  .  Courts review claims of outrageous misconduct "holistically," evaluating the "totality of the relevant circumstances." *Id.* (internal citations omitted).  In this Circuit, the court has mused that such cases could involve extreme physical or psychological abuse of a defendant, on the one hand, or cases where the government can fairly be said to have "created the crime or to have coerced the defendant's participation in it." *Santana*, 6 F.3d at 4 (internal quotations and citations omitted).

The defendants' contentions, even taken in the light most favorable to them, do not come close to meeting this demanding standard.[15]  The motion is largely premised on a few lines from a

---

[15] This Circuit has rejected claims of outrageous government misconduct in circumstances far more grave than those alleged here. *Anzalone,* 923 F.3d at 5-6 (dismissal not warranted where government ran a child pornography website, distributing child pornography, for two weeks because, in part, defendant's decision to use website was not the result of government design or coercion); *Therrien*, 847 F.3d at 11-17 (dismissal not warranted where law enforcement officer who set up drug and gun deals engaged in sexual relationship with defendant and failed to disclose such relationship to the prosecutor); *Luisi*, 482 F.3d at 58-59 (government's actions fell "well short of shocking the 'universal sense of justice'" where cooperator pressured defendant to engage in drug dealing); *United States v. Panitz*, 907 F.2d 1267, 1273 (1st Cir. 1990) (no outrageous government misconduct where "the authorities did nothing more than afford [defendant] an opportunity to take part in a pre-planned crime . . . [defendant] was an 'unwary criminal,' not an 'unwary innocent.'"); *United States v. George*, 839 F. Supp. 2d 430, 438-440 (D. Mass. 2012) (Gorton, J.) (dismissal not warranted despite government's failure to record all conversations with cooperating witness where, among other things, government did not engineer and direct the criminal enterprise from start to finish); *United States v. Horn*, 811 F. Supp. 739, 751-52 (D.N.H. 1992) (overruled on other grounds) (dismissal not warranted where prosecutor surreptitiously copied documents reviewed by defendants and was dishonest with the Court on multiple occasions, causing prejudice to defendants).

single note written by a cooperating witness less than two weeks after he was first approached by federal agents; before he fully accepted responsibility for his crime; before he entered into a cooperation agreement with the government; and at a time when, as he later conceded, *he was actively obstructing the government's investigation* (including by tipping off McGlashan, one of the defendants who now cites that note as "exculpatory"). Singer's own attorney has disclaimed Singer's statement. *See* Def. Br., Ex. O ("no one from the government side, AUSAs or agents, ever threatened, intimidated or directed my client to lie in my presence"). And the defendants' most serious allegation – that the government "coerce[d] an informant into lying on recorded calls to generate false inculpatory evidence," and "knowingly prosecute[d] those targets using that false evidence" – is flatly untrue. As illustrated by the defendants' own actions and statements to Singer *before* he began cooperating, the defendants had by that point already formed the criminal intent to falsify their children's athletic profiles and make *quid pro quo* payments styled as "donations" to university programs to gain admission for their children through athletics. Singer's later statements on the consensually recorded calls were consistent with his statements to the defendants before he began cooperating. Moreover, Singer's statements on the consensual calls about where the defendants' money went – almost all of which occurred weeks *after* his October 2 note – were *true*. That is precisely why the calls are such powerful evidence of the defendants' guilt. On the calls, the defendants *agreed* with Singer's statements, and the calls thus corroborate other evidence of what they knew and intended, and what Singer previously told them.[16]

---

[16] The defendants concede that it is permissible for cooperating witnesses to "tell lies to obtain inculpatory statements from criminal defendants" (Def. Br. at 16), and do not challenge the government's use of a ruse concerning an IRS audit as a pretext for Singer's calls. For that reason, their contentions concerning Singer's calls with defendant Wilson are particularly illogical. Singer's statements to Wilson concerning how a side door for his daughters would work were prospective in nature. Even assuming, *arguendo*, that Singer suggested to Wilson that coaches would personally pocket future bribes, the import of those statements is *not* that he was getting

As set forth above, for example, Singer instructed Giannulli and Loughlin *in writing* to send $50,000 to Donna Heinel at USC.  In 2016, he told Giannulli to make the check payable to "USC Athletics."  In 2017, he told both Giannulli and Loughlin to make it payable to "USC Womens Athletics," before revising the instruction and telling Giannulli to make it out to the "Galen Center Gift Account" instead.  Both times, the payments were for the purported recruitment of Giannulli's and Loughlin's daughters to the USC crew team, *even though neither daughter rowed crew*.  And in 2018, when Singer called Giannulli at the government's direction about Giannulli's additional payments to KWF as part of the scheme, he echoed what Giannulli had told his own financial advisor previously:  that the money was a "'donation'" to "work the system" to get his daughters into USC.  Singer said:  "I'm not gonna say anything about your payments going to Donna Heinel at USC to get the girls into USC, through crew."  Giannulli's response:  "Sure."  Likewise, in his consensual call with Loughlin, Singer said:  "[N]othing has been said about the girls, *your donations helping the girls get into USC to do crew even though they didn't do crew*."  Loughlin's response:  "So we just – *so we just have to say we made a donation to your foundation and that's it, end of story?*"

So, too, for the other defendants.  In 2017, days before flying to Los Angeles to have a corrupt proctor cheat on his son's ACT exam at Singer's corrupt West Hollywood test center, McGlashan made a purported $50,000 donation to KWF in payment of an invoice "Regarding West Hollywood College Prep," and Singer, in turn, made payments to the corrupt proctor and test administrator.  In the 2018 consensual call with McGlashan, Singer said:  "[A]s you know, when families pay for either, either taking the test or going through the side door, all the money goes

---

Wilson to "agree to a lie," as the defendants contend, but that he was offering Wilson the opportunity to commit a crime – an offer Wilson willingly accepted.

through my foundation, and then I pay it out to whoever needs to get paid – like I did for, you know, [your son] – [your son's] test when he took the test at West Hollywood Prep.  So I paid half of it to Mark and half of it to West Hollywood Prep through my foundation, so that the family essentially has no connection back to what has happened."  McGlashan's response:  "Mm-hmm."

And in September 2018, after Singer forwarded Zangrillo an email from Heinel confirming that his daughter had been admitted to USC "through athletics" – even though she did not play a sport – Zangrillo mailed Heinel a $50,000 check payable to "USC Women's Athletics," and wired an additional $200,000 to KWF, prompting his assistant to ask, "If it is donation, can it be deductible and go directly to USC?"  In a consensual call the following month, Singer told Zangrillo:  "I won't say that the, uh, the moneys [paid to KWF] went to go pay Donna Heinel for USC to get [your daughter] in."  Zangrillo's response:  "What will be the thing – what was the [daughter's] payment for?  Just so I know so we have the story straight."

The assorted other components of the defendants' misconduct claim add nothing.

- Their contention that the government sought to "entrap a parent" (Def. Br. at 15) is false.  That defendant, Gordon Caplan, pled guilty to an information before a different Session of this Court, within weeks of his arrest, and is not a party to these proceedings.  Their contention that the government improperly coerced *other* defendants into pleading guilty by threatening to bring additional charges against them is equally unavailing.  (Def. Br. at 28). The government plainly did not pressure *these* defendants into pleading guilty, and they have no standing to bring claims on behalf of third parties.

- Their contention that the government "draft[ed] scripts to guide Singer during calls" (Def. Br. at 8) and provided additional instructions to Singer verbally (*id*. at 13), is unremarkable.  Providing instructions to a cooperating witness during a proactive investigation is lawful, entirely appropriate, and good investigative practice.

- Their contention that the government "failed to investigate" the "allegations" in Singer's note (Def. Br.at 17) is misleading.  The government had no reason to investigate itself because, as noted, it knew that the note was untrue.

- Their contention that the government "fail[ed] to produce the notes or the information within them until now" (Def. Br. at 18) is meritless.  The government

– on its own initiative – produced the notes more than eight months before trial. The defendants have ample time to incorporate them into their strategy in whatever way they see fit. Moreover, to the extent the notes suggest that Singer told the defendants to direct purported donations to programs at USC, the defendants were aware of what Singer told them before the government produced the notes, and that information is also cumulative of other disclosures, including the emails in which Singer instructed the defendants to make those purported donations, and the canceled checks they wrote to USC. Indeed, the defendants concede that, one month before the government produced Singer's notes, it disclosed statements "by multiple FBI interviewees, including statements by Singer, that various Defendants thought their payments 'went directly to USC's program.'" (Def. Br. at 4). Accordingly, their contention that the notes were somehow revelatory in that regard is, by their own admission, untrue.

- Their contention that the notes were not actually privileged and that the government should not have treated them as such (Def. Br. at 21) is equally without merit. It was facially reasonable for attorneys who came across the notes to presume that Singer had drafted them for his attorney, and that his consent to search his phone was not intended as a waiver of the attorney-client privilege over such materials. Moreover, that presumption turned out to be correct. Singer *in fact* drafted the notes for his attorney, and provided them to him, and Singer's attorney *in fact* asserted privilege over them, before ultimately agreeing to waive the privilege on a limited basis at the government's request.

- Their contention that the government "failed to preserve relevant evidence on Singer's phones" (Def. Br. at 24) is not accurate and, at most, raises a jury question concerning Singer's credibility and the government's ability to meet its burden of proof. The defendants do not, because they cannot, contend that any of the purportedly missing evidence is exculpatory as to them, and their claim that the text messages Singer deleted were even "relevant" is baseless. There is no evidence that Singer deleted texts with any of the defendants charged in this case after he began cooperating. Moreover, as this Court has previously noted in connection with a defendant's claim that the government failed to preserve consensual recordings between a cooperating witness and a target: "Given the inevitable variables that accompany criminal investigations and the reality of scarce resources and personnel, the First Circuit has declined to adopt an 'all-or-nothing' rule with respect to the recording of conversations in sting operations. Indeed, the calculus is especially complicated when the government uses a confidential informant because assessment of an informant's credibility is a task for the jury." *George*, 839 F. Supp. 2d at 439-40.

- Their contention that the government "did its best to ensure Defendants did not obtain exculpatory evidence from other sources" (Def. Br. at 30) is untrue and misleading. The defendants cite a hearing before Magistrate Judge Kelley involving a motion brought by USC to quash a subpoena issued by defendant Zangrillo – but omit to note that Judge Kelley *directed* the government, which was not a party to the proceeding, to attend. *See* Ex. NNN at 3-4 [Sep. 18, 2019

transcript].   At the hearing, the government was asked its position about Zangrillo's subpoena, and said that the materials he sought from USC were irrelevant to the charges against him.   *Id.* at 70-72.   There is nothing improper about that.

Accordingly, whether taken individually or collectively, the defendants' allegations fall far short of justifying their request that this Court dismiss the indictment.[17]

B.   <u>The Consensual Recordings Were Not Tainted and Should Not Be Suppressed</u>

Citing this Court's inherent "supervisory powers," the defendants next contend that the Court should suppress the purportedly "tainted consensual recordings involving Singer and his clients."   (Def. Br. at 33).   Again, the defendants ignore both the applicable law and the relevant facts.

"Guided by considerations of justice, . . . and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress."   *United States v. Hastings*, 461 U.S. 499, 505 (1983) (internal quotations and citations omitted).   There are three purposes underlying the use of a court's supervisory powers: (1) to implement a remedy for violation of recognized rights; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and (3) to deter illegal conduct.   *Id.*; *United States v. Horn*, 29 F.3d 754, 759 (1st Cir. 1994).   The goals implicated by supervisory powers, however, are not implicated if the alleged errors are harmless.

---

[17] The defendants' citations to *United States v. Pollock*, 417 F. Supp. 1332 (D. Mass. 1976) and *United States v. Diabate*, 90 F. Supp. 2d 140 (D. Mass. 2000), are easily distinguishable and do not help their cause.   *See Pollock*, 417 F. Supp. 1332 (dismissal warranted where government intentionally tampered with and destroyed evidence directly material to the defendant's guilt); *Diabate*, 90 F. Supp. 2d 140 (dismissal warranted where government produced exculpatory evidence days before trial and destroyed agent notes and defendant was prejudiced thereby). Likewise, *United States v. Richman* – which stands for the proposition that dismissal of an indictment is not warranted for a failure to disclose exculpatory information absent bad faith, willful misrepresentations and prejudice – only bolsters the conclusion that the defendants' motion to dismiss should be denied, as none of those factors are present here.   *See Richman*, 600 F.2d 286, 291-92 (1st Cir. 1979).

*Hastings*, 461 U.S. at 506.  This Circuit has indicated that, "[w]hen confronted with extreme misconduct and prejudice as a result of delayed disclosure, this court will consider invoking its supervisory powers to secure enforcement of better prosecutorial practice and reprimand of those who fail to observe it."  *United States v. Osorio*, 929 F.2d 753, 763 (1st Cir. 1991) (invocation of supervisory powers not warranted where government's failure to disclose exculpatory information was negligent and the outcome of the trial was not prejudiced).  Finally, as with the doctrine of outrageous government misconduct, the Court's supervisory powers should be used sparingly, s*ee Santana*, 6 F.3d at 9-10, and be narrowly tailored to the objective, *Horn*, 29 F.3d at 760.

The defendants' claim that this Court should exercise its supervisory powers to suppress the consensual recordings depends almost entirely upon the notion that the recordings are tainted. But, for all the reasons set forth above, they are not.  Even if the government *had* instructed Singer to lie to the defendants about where their money had gone – which it did *not* – the appropriate remedy would be vigorous cross-examination at trial, not suppression.  *See Horn*, 29 F.3d at 760 ("[I]t is inappropriate for courts to attempt to use the supervisory power to justify an extreme remedy when, short of such heroic measures, the means are at hand to construct a satisfactory anodyne more narrowly tailored to the objective.").

Moreover, while the defendants argue that the Court also should suppress the consensual recordings to deter the government's purported misconduct throughout this case, such a remedy would not be narrowly tailored to the objective.  If the recordings are not tainted, there is no connection between the remaining alleged misconduct (allowing Singer to delete text messages, withholding exculpatory evidence) and the proposed sanction.  Such a use of the Court's supervisory power would thus contravene the well-established law of this Circuit.  *Horn*, 29 F.3d at 760.

Likewise, the government's concession that Singer's notes should have been produced earlier under the Local Rules does not warrant suppression of the recordings – particularly where, as here, the notes were produced more than half a year before trial, leaving ample time for the defendants to incorporate them into their trial strategies.  For all these reasons, the defendants' argument fails.

C.  <u>The Defendants Are Not Entitled to an Evidentiary Hearing</u>

Finally, the defendants seek an evidentiary hearing to try to obtain evidence to shore up their otherwise baseless motion and, in essence, secure an opportunity to depose likely government witnesses before trial.  Their request should be denied.

"It is apodictic that a criminal defendant is not entitled, as a matter of right, to an evidentiary hearing on every motion he deigns to file."  *United States v. Staula*, 80 F.3d 596, 603 (1st Cir. 1996).  Rather, a hearing is required *only if* the moving party makes a threshold showing that material facts are in dispute *and* that*,* if such disputes were resolved in his favor, he would be entitled to relief.  *Id.*

The questions "about the scope and extent of the Government's misconduct" identified in the defendants' brief (Def. Br. at 34) do not entitle them to a hearing because there was no misconduct and, in any event, their questions have already been answered or are immaterial to the relief they seek, as set forth below.

- To the extent the defendants seek "the specifics of Singer's interactions with the agents as described in the October 2 note," the note speaks for itself and is demonstrably untrue for all the reasons set forth above.

- To the extent the defendants seek to explore "whether the agents acted inappropriately in other parts of the investigation," their premise – that the agents acted inappropriately in *any* part of the investigation – is untrue and does not, in any event, entitle them to the fishing expedition they request.

- To the extent they wonder "what steps (if any) were taken to investigate or address" the purported conduct described in the October 2 note, the answer is none, because the description was untrue.

- To the extent they want to know who on the prosecution team "was aware of or involved" in deeming Singer's notes potentially privileged and the basis for that decision, the government has already disclosed that information, and the defendants acknowledge in their brief that the notes were, in fact, prepared for and provided to Singer's attorney who, in fact, asserted privilege over them.

- Finally, to the extent they seek to know "what other evidence" the government has not produced on the basis of privilege, the government has already disclosed categories of documents that the government expects it will withhold based on privilege (*e.g.*, presumptively privileged emails obtained from search warrants on co-defendants' email accounts).  In addition, the government has disclosed that there are emails and documents between Singer and his criminal defense counsel, and between Singer and his corporate counsel, that are presumptively privileged. The government has requested that Singer's counsel produce a privilege log of communications between Singer and his criminal defense counsel, which the government intends to produce to the defendants.  While the government may ultimately seek to withhold some or all of those documents on the basis of privilege, the defense will have an opportunity to challenge the government's determination by filing a discovery motion once that issue becomes ripe.

An evidentiary hearing in this case would serve no purpose.  Even if the contentions in Singer's notes were true – and they are not – they would not justify taking the unprecedented step of dismissing the indictment or suppressing the consensual recordings.  At most, Singer's note raises issues for cross-examination and argument at trial, and questions of credibility and proof that are properly reserved for the jury.

## CONCLUSION

Criminal defendants are entitled to a vigorous defense.  But making baseless claims that evidence was fabricated to frame innocent parties goes too far.  For all of the reasons described herein, the defendants' motion is factually and legally wrong, and should be denied without argument or a hearing.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


By:     /s/ Stephen E. Frank
Karin M. Bell
Stephen E. Frank
Assistant United States Attorneys


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

/s/ Stephen E. Frank
Stephen E. Frank
Assistant United States Attorney

34